# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## Harrisonburg Division

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

04/01/2025

LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

**JACOB T. UNGER,**
       *Plaintiff*,

            **v.**                                    **CIVIL ACTION NO.**  5:25cv00029

**TIMOTHY C. CARTER,**                        **JURY TRIAL DEMANDED**
**individually,**
       *Defendant*

## COMPLAINT

Plaintiff Jacob T. Unger ("Plaintiff" or "Deputy Unger"), by and through counsel, brings this action against Defendant Timothy C. Carter ("Sheriff Carter" or "Defendant"), in his individual capacity, and alleges as follows:

## PRELIMINARY STATEMENT

1. This civil rights and state law action arises from the wrongful termination of Plaintiff Jacob T. Unger from his position as a Deputy Sheriff with the Shenandoah County Sheriff's Office, and subsequent retaliatory actions that violated his constitutional and state law rights.

2. On April 5, 2024, Deputy Unger responded to a motor vehicle crash and administered a Preliminary Breath Test (PBT) to the driver, Kyle Ortts, which registered a blood alcohol content of 0.098, above the legal limit of 0.08. While initially observing no obvious signs of impairment, Unger was in the process of investigating the incident as a potential DUI case when he was explicitly

1

directed by his supervisors—Master Deputy Hank Hoover and Sergeant Keith Staffa—to turn off his body camera, issue a lesser charge of reckless driving rather than pursue a DUI charge, and the following day, to destroy the summons after it was discovered that an incorrect code section had been cited.

3. Deputy Unger followed his supervisors' directives, as required by department policy establishing the chain of command and the obligation of subordinate officers to follow supervisory instructions. Despite this, on April 22, 2024, Sheriff Timothy C. Carter terminated Deputy Unger's employment, while imposing only minor discipline on the supervisors who had directed Deputy Unger's actions.

4. Following Deputy Unger's termination, Sheriff Carter published false and defamatory statements characterizing Deputy Unger's actions as "conduct unbecoming a law enforcement officer" that "demonstrated both an inability and an unwillingness to uphold his sworn oath." These statements were published in an official Sheriff's Office YouTube video that received 7,406 views, an accompanying press release dated May 7, 2024, and through other media appearances including a television interview with WHSV where he reiterated these claims.

5. Sheriff Carter deliberately failed to disclose in these public statements and press releases that Deputy Unger had been following the explicit instructions of his supervisors, presenting a false and misleading account of the events to the public.

6. Sheriff Carter also attempted to permanently eliminate Deputy Unger's career in law enforcement by filing false and defamatory statements with the Virginia Department of Criminal Justice Services (DCJS), seeking to have Deputy Unger decertified as a law enforcement officer for alleged "serious misconduct."

7. However, on November 21, 2024, following a full evidentiary hearing, the Executive Committee of the Criminal Justice Services Board voted unanimously to reinstate Deputy Unger's law enforcement certification, providing independent validation that his conduct did not warrant termination or decertification and completely vindicating him against Sheriff Carter's accusations.

8. Sheriff Carter attempted to interfere with Deputy Unger's efforts to secure employment with the Strasburg Police Department, causing further harm to his career and reputation.

9. Through this action, Deputy Unger seeks to vindicate his constitutional and state law rights, obtain compensation for the substantial damages he has suffered, and deter similar misconduct in the future.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for civil actions arising under the Constitution, laws, or treaties of the United States, and pursuant to 28 U.S.C. § 1343(a)(3), which confers jurisdiction for actions brought to redress deprivations of civil rights.

11. Plaintiff's claims under 42 U.S.C. § 1983 arise under U.S. Const. amends. I, XIV, which guarantee free speech, due process, and equal protection of the laws.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claims that they form part of the same case or controversy under U.S. Const. art. III.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides within this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

14. Venue is proper in the Harrisonburg Division of this Court because the events giving rise to Plaintiff's claims occurred in Shenandoah County, which is within the Harrisonburg Division pursuant to Local Rule 2(a) of the Western District of Virginia.

## PARTIES

15. Plaintiff Jacob T. Unger is a citizen of the Commonwealth of Virginia who resides in Mount Jackson, Virginia, located in Shenandoah County. From December 2021 until April 22, 2024, Plaintiff was employed as a Deputy Sheriff with the Shenandoah County Sheriff's Office.

16. Defendant Timothy C. Carter is the Sheriff of Shenandoah County, Virginia. As Sheriff, Defendant Carter is responsible for establishing policies and

procedures for the Shenandoah County Sheriff's Office and for supervising all personnel, including making final decisions regarding discipline and termination. At all relevant times, Defendant Carter acted under color of state law. Defendant Carter is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment Background

17. Plaintiff Jacob T. Unger was hired as a Deputy Sheriff with the Shenandoah County Sheriff's Office in December 2021, after successfully completing all required training and certification requirements.

18. During his employment with the Shenandoah County Sheriff's Office, Plaintiff consistently performed his duties in a professional manner and received no significant disciplinary actions prior to the events at issue in this case.

19. On April 15, 2024, just days before the suspension and termination at issue in this case, Plaintiff received a commendation letter from the Prince William County Police Chief for his competence and professionalism in responding to an incident on April 2, 2024, involving a carjacking suspect and subsequent homicide investigation.

20. Plaintiff successfully completed specialized training in DUI detection and investigation, including a Standardized Field Sobriety Testing Basic Course in April 2022 and a Standardized Field Sobriety Refresher Course in March 2024, just one month before the incident in question.

21. Plaintiff was familiar with and adhered to the Shenandoah County Sheriff's Office Standard Operating Procedures, including those governing chain of command (SOP 1-3), code of conduct (SOP 2-5-C), and field camera systems (SOP 4-9), which were later cited by Sheriff Carter in his submission to the Department of Criminal Justice Services to support the decertification request.

### The April 5, 2024 Incident

22. On April 5, 2024, at approximately 23:10 hours, Plaintiff was dispatched to investigate a motor vehicle crash on Race Track Road in Edinburg, Virginia.

23. Plaintiff arrived at the scene together with Master Deputy Hank Hoover. Upon arrival, they discovered that a blue Dodge Ram pickup truck had crashed into a barn structure, causing approximately $10,000 in damage to both the vehicle and barn.

24. The driver, identified as Kyle Ortts, met the officers in the field between the road and the crash site. While Mr. Ortts recognized Plaintiff from having attended the same high school years earlier (graduated 2014), Plaintiff and Mr. Ortts were not friends and did not associate socially or have any relationship beyond this minimal prior acquaintance.

25. During the initial assessment, Plaintiff observed no obvious signs of impairment from Mr. Ortts—specifically noting the absence of slurred speech, glassy eyes, unsteady gait, or odor of alcohol—as documented in his incident report.

26. Master Deputy Hoover asked Plaintiff if there was an odor of alcohol on Mr. Ortts. Plaintiff replied there was not, and Hoover agreed with this assessment. Despite this, Hoover suggested administering a Preliminary Breath Test (PBT), stating they should "just see where he is at."

27. Plaintiff activated his department-issued body camera in accordance with SOP 4-9(G), which requires that "The appropriate field camera system, if so equipped, shall be fully activated (audio and video) as soon as possible to record activity related to law-enforcement incidents in the field."

28. Plaintiff asked Mr. Ortts if he would take a PBT, to which Ortts responded that "he would do whatever y'all want me to do." Before administering the test, Plaintiff asked Ortts if he was "going to blow zeros," at which point Ortts admitted having "a couple [beers] earlier."

29. The preliminary breath test showed that Mr. Ortts had a blood alcohol content of 0.098, which exceeds the legal limit of 0.08 in Virginia.

30. As documented in the body camera footage transcript later released by Sheriff Carter on May 7, 2024, Plaintiff informed Mr. Ortts multiple times that he was over the legal limit:

> Plaintiff: "I know, but you're over the legal limit."

> Mr. Ortts: "What's the over- what's the limit?"

> Plaintiff: "0.08 is the legal limit."

Mr. Ortts: "I just had a few beers and that was earlier on and that was it. Like I said, I promise you I am not [expletive] up by any means, I know. Okay, please, please help me, help me."

Plaintiff: "All right, let's walk over here."

Mr. Ortts: "I know you got to do your job."

Plaintiff: "I do got to do my job, but..."

Mr. Ortts: "I'm not trying to be that guy, okay."

Plaintiff: "All right, but the legal limit in Virginia is 0.08, okay? You blew 0.098, right? So you are under the influence of alcohol, okay? You admitted to driving."

31. Plaintiff intended to continue the DUI investigation, which would normally include administering standardized field sobriety tests and potentially arresting Mr. Ortts for driving under the influence.

32. Before Plaintiff could proceed with these steps, Master Deputy Hoover instructed Plaintiff to disable his body camera. The body camera transcript shows the following exchange:

Plaintiff: "You cut yours off?"

Master Deputy Hoover: "Cut it off, yeah."

8

33. Plaintiff responded, "Cut it off?" to confirm the instruction, and Master Deputy Hoover confirmed, "Yes."

34. Pursuant to SOP 1-3(IV)(A), personnel at the Shenandoah County Sheriff's Office "shall follow the chain-of-command in accordance with this directive and other established procedures to ensure the proper delivery of services." Further, SOP 1-3(IV)(A)(1) specifies that "each organizational component is under the direct command of only one (1) supervisor at any given time; therefore, personnel are responsible to only one (1) supervisor."

35. SOP 1-3(IV)(A)(1) expressly requires that "All personnel shall promptly obey any lawful order of a supervisor," and establishes that "Personnel refusing a lawful order can be subject to disciplinary action in accordance with SOP 2-5-H; Appointee Discipline."

36. SOP 1-3 creates not merely a general expectation but a specific, enforceable requirement that subordinate officers follow supervisory directives. The policy specifically warns that "Personnel refusing a lawful order can be subject to disciplinary action in accordance with SOP 2-5-H; Appointee Discipline." This explicit policy creates a paradoxical situation where Plaintiff was subject to discipline if he refused to follow supervisory directives, yet was terminated for following those same directives, while the supervisors who issued the improper directives received only minor discipline.

37. Following the directive from Master Deputy Hoover, his superior officer, Plaintiff deactivated his body camera, in compliance with the chain of command and his understanding of his duty to obey supervisory directives.

38. Sergeant Keith Staffa subsequently arrived at the scene. Upon consultation with Staffa, Plaintiff was informed that he had "screwed up" the DUI investigation by conducting the breath test first, rather than conducting field sobriety tests before administering the PBT. Sergeant Staffa specifically advised that the DUI charge would not hold up in court because of this procedural issue.

39. Based on this conversation and the resulting directives from his supervisors, Plaintiff was instructed not to pursue a DUI charge despite evidence of intoxication above the legal limit, but instead to issue a citation for reckless driving (failure to maintain proper control).

40. Following his supervisors' directives, Plaintiff issued Mr. Ortts a summons for reckless driving, rather than arresting him for driving under the influence.

### The April 6, 2024 Summons Incident

40. On April 6, 2024, at approximately 18:00 hours, Sergeant Staffa contacted Plaintiff and instructed him to come to the office immediately to discuss the summons issued to Mr. Ortts.

41. Upon arrival at the Sheriff's Office, Sergeant Staffa informed Plaintiff that the summons contained an incorrect code section (general speed instead of failure to maintain proper control) and presented Plaintiff with two options:

   a. Take the summons to a magistrate, seek the proper charge, serve Mr. Ortts, and keep copies for the front office; or

   b. Take both copies of the summons (Plaintiff's and Mr. Ortts') and shred them, with "none has to go to court, and no one will be charged."

42. According to Plaintiff's incident report of April 22, 2024, Sergeant Staffa stated: "I am not telling you what to do, but that's what I would do. It is not like Ortts family isn't got money and we both know they are going to repair the damages."

43. When Plaintiff asked if he would face any consequences for destroying the summons, Sergeant Staffa assured him: "No, nothing will come back on you. It is handled and dealt with, you have nothing to worry about."

44. Master Deputy Hoover, who was present during this conversation, initially expressed concern about destroying the summons but ultimately deferred to Sergeant Staffa's recommendation, stating according to Plaintiff's incident report: "Alright, Unger just shred it I guess."

45. Following his supervisor's recommendation and in compliance with the chain of command, Plaintiff contacted Mr. Ortts and arranged for him to return to the Sheriff's Office to surrender his copy of the summons.

46. On April 6, 2024, Mr. Ortts came to the Sheriff's Office and met with Plaintiff in the parking lot, a meeting that was captured on the building's surveillance cameras.

47. During this meeting, Plaintiff explained to Mr. Ortts that there had been an issue with the code section on the summons, retrieved Mr. Ortts's copy of the summons, and advised him that he would not need to appear in court.

48. Following Sergeant Staffa's instructions, Plaintiff subsequently destroyed both copies of the summons.

### Protected Speech Outside the Chain of Command

49. On the morning of April 6, 2024, Plaintiff encountered Virginia State Trooper Marshall Brill while fueling his patrol vehicle.

50. During their conversation, Plaintiff expressed concerns to Trooper Brill about how the incident had been handled, particularly the instructions to turn off his body camera and to issue a lesser charge despite evidence of intoxication above the legal limit. According to Plaintiff's incident report, he specifically mentioned that "I didn't feel right about it."

51. Plaintiff's comments to Trooper Brill were motivated by his concern for public safety and the integrity of law enforcement, not by personal grievances related to his employment. This speech addressed matters of public concern, specifically the proper enforcement of DUI laws and potential preferential treatment in law enforcement.

52. Importantly, Plaintiff's conversation with Trooper Brill was not part of his official job duties, was not conducted within his chain of command, and was not the type of speech he was paid to deliver as part of his employment. Rather, Plaintiff was speaking as a citizen on matters of public concern as established in *Garcetti v.*

*Ceballos*, 547 U.S. 410, 421 (2006) and *Lane v. Franks*, 573 U.S. 228, 240 (2014) (holding that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee— rather than citizen—speech").

53. The Fourth Circuit has consistently held that speaking outside the chain of command about potential misconduct by supervisors constitutes protected citizen speech rather than employee speech. *See Durham v. Jones*, 737 F.3d 291, 301-02 (4th Cir. 2013) (finding protected speech where officer reported departmental misconduct outside chain of command). Similarly, in *Hunter v. Town of Mocksville*, 789 F.3d 389 (4th Cir. 2015), the Court held that officers who reported suspected corruption to the Governor's office were engaging in protected citizen speech, emphasizing that "speech about serious governmental misconduct" is a matter of significant public concern, particularly when it involves law enforcement agencies.

54. Upon information and belief, Trooper Brill subsequently communicated these concerns to the Commonwealth Attorney's Office.

**Retaliatory Adverse Employment Action**

54. On April 19, 2024, nearly two weeks after the incident with no prior indication of any issues, Plaintiff received a phone call from Lieutenant Bo Hall informing him that he was being placed on administrative suspension without pay, effective immediately, pending an investigation of the April 5 incident.

55. Lieutenant Hall explicitly informed Plaintiff that "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney," demonstrating

a direct causal connection between Plaintiff's protected speech during his conversation with Trooper Brill and the adverse employment action.

56. This statement by Lieutenant Hall provides clear evidence of retaliatory motive, directly linking Plaintiff's suspension to his protected speech rather than to his conduct during the April 5 incident, which had not prompted any investigation or discipline prior to his protected speech.

57. Plaintiff was instructed to surrender his badge, service weapon, and other department equipment, which he did without incident.

**Termination Meeting**

58. On April 22, 2024, Plaintiff was directed to attend a meeting at the Sheriff's Office with Sheriff Carter, Captain Glenn Ogle, and Major Kolter Stroop at 17:00 hours.

59. During this meeting, Sheriff Carter questioned Plaintiff about the April 5 incident and his relationship with Mr. Ortts. Plaintiff truthfully explained that he was not friends with Mr. Ortts and detailed the events and his actions following supervisory directives.

60. When Plaintiff attempted to explain that he was following his supervisors' instructions, Sheriff Carter became angry, interrupted him, and showed him surveillance video of his meeting with Mr. Ortts in the parking lot, stating: "So you're not good friends with him, well watch this look you pat him on the back twice and then fist bump him and shakes his hand."

61. Sheriff Carter repeatedly accused Plaintiff of dishonesty despite Plaintiff's attempts to explain that he was following the chain of command as required by department policy.

62. Sheriff Carter then presented Plaintiff with a termination letter dated April 22, 2024, which stated in part:

> "Your actions demonstrate that you are not committed to obeying the laws of the Commonwealth of Virginia. Your actions in this incident do not uphold the public trust, in that you did not properly and fully investigate the incident of Driving Under the Influence, and the crash as it relates to a later decision of Driving Reckless, to the point that you improperly destroyed records associated with this incident and there was absolutely no effort to follow through with the proper charge concerning the driver's actions. Lastly, your actions were unethical and do not adhere to the ethical standards for a law enforcement officer of this Office, nor the Commonwealth of Virginia.
>
> Your actions in this incident are conduct unbecoming a law enforcement officer and demonstrate both, an inability and an unwillingness to uphold your sworn oath."

63. After presenting the termination letter, Sheriff Carter stated: "You are fucking fired, get the fuck out of my office. I swear to God Jacob if you talk to any of your family and friends about this or anything bad about this office, I swear to god I will post these videos on social media and have your [sic] exposed. Now get the fuck out of my office."

64. Sheriff Carter further stated: "I swear to go[d] he better not be driving my fucking cruiser; someone better stop him he better not drive off in it," despite the fact that Plaintiff had already surrendered his patrol vehicle days earlier.

15

65. Throughout the termination process, Plaintiff was not afforded adequate notice of the specific allegations against him, a meaningful opportunity to present his side of the story, or a fair and impartial decision-maker.

66. The disparate treatment between Plaintiff and his supervisors is particularly striking. Plaintiff, who was merely following the explicit directives of his supervisors as required by department policy (SOP 1-3), was terminated and subjected to a decertification attempt that threatened his entire law enforcement career. In contrast, Sergeant Staffa and Master Deputy Hoover, who actually directed the actions for which Plaintiff was terminated, received only minor discipline. This stark disparity in treatment for the same underlying conduct strongly suggests that Plaintiff's termination was motivated by factors other than the April 5-6 incident itself.

67. Plaintiff was terminated for following the directives of his supervisors, while those same supervisors—Sergeant Staffa and Master Deputy Hoover—received only minor discipline despite their more significant roles in directing the improper handling of the investigation.

## Post-Termination Public Statements

67. On May 7, 2024, Sheriff Carter issued a press release and video statement regarding Plaintiff's termination, which received 7,406 documented views on YouTube.

68. In this video statement, Sheriff Carter made the following specific statements about Plaintiff:

16

"On the 19th of April 2024, I became aware of an incident that occurred on the 5th of April 2024, which a deputy sheriff was called to investigate a motor vehicle crash. After reviewing the incident, even though the driver admitted to consuming alcohol at least four times and having crashed into a structure, no effort was made to investigate the drunk driving incident.

The body field camera video associated with this crash is linked to this release. It shows that the deputy had Reasonable Suspicion to investigate the potential crime, but the video was terminated after a brief communication with the driver and after the deputy performed a preliminary breath test or PBT, which also indicated that the driver had potentially consumed alcohol prior to the crash.

The driver asked the deputy what the PBT showed, which it showed a 0.098 blood alcohol content, and the driver was told that he was over the legal limit and driving intoxicated at least five times by the deputy.

The investigating Deputy approached another Patrol deputy and later the deputy approached a supervisor, and the field camera was cut off. The deputy made a decision to charge reckless driving and was instructed the proper code section for this violation.

The summons was issued and the adult driver was allowed to leave with a sober driver. The next day, the deputy was notified by his Patrol sergeant that the code section on the summons that he had issued was not the proper code section that he was instructed to cite. His supervisor told him that he could destroy the summons and go before a magistrate to obtain a summons with the proper charge, but also could destroy the summons since the man had not gone before the court.

The deputy contacted the driver and had him return his copy of the summons. There is a video of this exchange linked to this release. You may also notice that the deputy offered and received a fist bump with the driver as he left the Sheriff's Office.

> On the 22nd of April, I terminated the deputy's appointment to this office. His actions in this incident are conduct unbecoming a law enforcement officer and demonstrated both an inability and an unwillingness to uphold his sworn oath."

69. Sheriff Carter also appeared in a televised interview with WHSV (published May 8, 2024) where he stated that "there's an expectation by the public with regard to public trust and accountability" and suggested that Plaintiff had failed to uphold this trust.

70. Sheriff Carter selectively released portions of Plaintiff's body camera footage that presented an incomplete and misleading portrayal of the events, omitting crucial context about the supervisory directives that Plaintiff received.

71. Sheriff Carter failed to disclose in his public statements that Plaintiff had been following the explicit instructions of his supervisors, creating the false impression that Plaintiff had acted on his own initiative in deactivating his body camera and in not pursuing a DUI charge.

72. In an article published by The Northern Virginia Daily on May 7, 2024, Sheriff Carter was quoted as saying "it was obvious to me as I looked into this incident that the deputy knew the driver" and "There was some relationship, friendship between the two," falsely suggesting that Plaintiff's actions were motivated by personal friendship with Mr. Ortts rather than by following supervisory directives.

73. Sheriff Carter's public statements were deliberately misleading and damaged Plaintiff's professional reputation in the law enforcement community and the broader public.

74. Sheriff Carter's statements placed a stigma on Plaintiff's reputation, were made in conjunction with his termination, were false, were made public, directly implicated Plaintiff's competence as a professional, and Plaintiff was not afforded a name-clearing hearing.

75. Following his termination, Plaintiff has learned that Sheriff Carter has continued to make disparaging statements about him in the community, including claims that Plaintiff "lied" to Sheriff Carter, further damaging his reputation and standing in the community.

## DCJS Decertification and Reinstatement

76. Following Plaintiff's termination, on April 23, 2024, Sheriff Carter submitted a Notification of Eligibility for Decertification to the Virginia Department of Criminal Justice Services (DCJS), seeking to have Plaintiff decertified as a law enforcement officer.

77. In the decertification notification (DC-1 form), Sheriff Carter specifically characterized Plaintiff's conduct as "serious misconduct" warranting decertification under Va. Code Ann. § 15.2-1707(B)(iv) for "engaging in serious misconduct as defined in statewide professional standards of conduct adopted by the Board."

78. Sheriff Carter included an attachment to the DC-1 form entitled "Investigative Summary," which contained the following false and defamatory statements:

> "Unger's actions demonstrate that he is not committed to obeying the laws of the Commonwealth of Virginia. His actions in this incident do not uphold the public trust, in that he did not properly and fully investigate the incident of Driving Under the Influence and the crash as it relates to a later decision of Driving Reckless, to the point that Unger improperly destroyed records associated with this incident and there was absolutely no effort to follow through with the proper charge concerning the driver's actions. Lastly, Unger's actions were unethical and do not adhere to the ethical standards for a law enforcement officer of this Office, nor the Commonwealth of Virginia.
>
> Unger's actions in this incident are conduct unbecoming of a law enforcement officer and demonstrate both, an inability and an unwillingness to uphold his sworn oath."

79. Sheriff Carter's decertification filing deliberately omitted the critical fact that Plaintiff was acting under the direct supervision and following the explicit instructions of his superior officers, Master Deputy Hoover and Sergeant Staffa.

80. On May 10, 2024, based on Sheriff Carter's submission, DCJS decertified Plaintiff as a law enforcement officer, preventing him from seeking employment in law enforcement in Virginia.

81. Plaintiff requested a hearing before the Executive Committee of the Criminal Justice Services Board to appeal his decertification, incurring legal expenses of at least $6,991.50 as documented in legal invoices, with $4,491.50 remaining due after his initial $2,500 retainer.

82. On July 26, 2024, the first DCJS hearing regarding Plaintiff's decertification appeal was held. This hearing was public and conducted with both in-person and virtual attendance options.

83. During this hearing, Sheriff Carter observed that Strasburg Police Chief Wayne Sager was attending via Zoom. Sheriff Carter subsequently contacted Chief Sager following the hearing to question why he was in attendance.

84. When Chief Sager explained that he believed "Jacob's a good kid" and that if Plaintiff was reinstated, he would likely offer him a job, Sheriff Carter became noticeably "flustered." This was the last contact Chief Sager had with Sheriff Carter concerning this matter.

85. On October 23, 2024, DCJS issued a Notice of Formal Hearing to Plaintiff, informing him that the Executive Committee of the Criminal Justice Services Board would conduct a Formal Hearing on November 21, 2024.

86. On November 21, 2024, the Executive Committee conducted a full evidentiary hearing during which both Plaintiff and representatives from the Shenandoah County Sheriff's Office presented evidence and testimony.

87. Following this hearing, the Executive Committee voted unanimously to reinstate Plaintiff's law enforcement certification, finding "sufficient cause to reinstate [Plaintiff's] eligibility to be certified as a Law-Enforcement and Jail Officer pursuant to [Va. Code Ann. § 15.2-1708(D)]."

88. The Northern Virginia Daily later reported that Plaintiff's attorney, David Silek, stated the decision "totally vindicated my client and the wrongful things that the

sheriff said about him and accused him of." Silek also stated that his client "was punished for doing what his superior officers told him to do while investigating the crash."

89. The Executive Committee's unanimous vote to reinstate Plaintiff's certification constitutes a significant factual finding by an independent, specialized state agency with expertise in law enforcement standards. This decision necessarily determined that Plaintiff's conduct did not constitute the "serious misconduct" alleged by Sheriff Carter, and that Plaintiff remained fit to serve as a law enforcement officer. This independent evaluation directly contradicts Sheriff Carter's characterization of Plaintiff's actions as "conduct unbecoming a law enforcement officer" and demonstrating "an inability and unwillingness to uphold his sworn oath." The fact that this independent body composed of law enforcement experts unanimously rejected Sheriff Carter's characterization of Plaintiff's conduct is powerful evidence of the pretextual nature of Plaintiff's termination.

90. This independent review and unanimous reinstatement decision provides objective validation that Plaintiff's conduct did not warrant termination or decertification.

## Employment Interference

90. Following the reinstatement of his law enforcement certification, Plaintiff sought employment with the Strasburg Police Department in Strasburg, Virginia.

91. Plaintiff received a conditional offer of employment from the Strasburg Police Department with a projected start date of January 13, 2025, and a starting salary of $24.58 per hour.

92. Sheriff Carter's improper attempt to influence Chief Sager regarding Plaintiff's potential employment by questioning his presence at Plaintiff's DCJS hearing demonstrates the continuation of Defendant's retaliatory campaign against Plaintiff beyond termination.

93. Sheriff Carter observed Chief Sager attending the virtual hearing via Zoom on July 26, 2024, and specifically initiated contact to question his presence. When Chief Sager explained that he believed "Jacob's a good kid" and intended to offer Plaintiff employment if reinstated, Defendant Carter became noticeably "flustered," demonstrating Defendant's improper attempt to monitor and potentially influence Plaintiff's employment prospects.

94. Defendant's improper interference attempt constitutes a compensable legal injury under Virginia law, regardless of whether it ultimately prevented Plaintiff's employment. Virginia courts recognize that tortious interference claims focus on the improper methods employed rather than their effectiveness, as established in *Lewis-Gale Med. Ctr., L.L.C. v. Alldredge*, 282 Va. 141, 149 (2011).

95. Despite Sheriff Carter's interference attempts, Plaintiff successfully began his employment with the Strasburg Police Department on January 13, 2025, as originally scheduled.

96. As of February 25, 2025, Plaintiff was actively serving as a police officer with the Strasburg Police Department, handling investigations and filing criminal complaints, as documented in local news reports.

97. Sheriff Carter's improper attempt to influence Chief Sager regarding Plaintiff's potential employment demonstrates the continuation of Defendant's retaliatory campaign against Plaintiff beyond termination. This ongoing conduct further damaged Plaintiff's professional standing in the law enforcement community and compounded the emotional distress and reputational harm he had already suffered as a result of Defendant's prior actions.

## Damages

98. As a direct and proximate result of Defendant's actions, Plaintiff has suffered substantial damages, including:

    a. Lost wages and benefits from April 22, 2024, until he secured alternative employment;

    b. Reduced wages during his subsequent employment compared to his salary as a deputy sheriff;

    c. Legal expenses of at least $6,991.50 incurred in challenging his DCJS decertification;

    d. Damage to his professional reputation in the law enforcement community;

    e. Emotional distress, humiliation, and mental anguish;

    f. Interference with future career opportunities; and

    g. Other consequential damages.

99. Plaintiff has mitigated his damages by securing alternative employment first at a factory position at approximately $19.00 per hour beginning June 3, 2024, and subsequently at Trex Company at approximately $23.17 per hour.

100. Despite his efforts to mitigate damages, Plaintiff has suffered significant economic and non-economic harm that continues to the present day.

## CAUSES OF ACTION

## COUNT I: FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

101. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102. U.S. Const. amend. I protects citizens' rights to free speech, including the right of public employees to speak on matters of public concern without fear of retaliation.

103. To establish a First Amendment retaliation claim, a plaintiff must demonstrate: (1) that he engaged in protected speech; (2) that the defendant's retaliatory action adversely affected the plaintiff's protected speech; and (3) that a causal relationship existed between the protected speech and the retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

104. When the plaintiff is a public employee, the court must first determine whether the employee spoke as a citizen on a matter of public concern rather than as an employee about a personal employment matter. *Garcetti*, 547 U.S. at 418; *Connick v. Myers*, 461 U.S. 138, 147 (1983).

105.     Plaintiff's conversation with Trooper Marshall Brill constitutes protected speech under the First Amendment. As established in *Lane*, 573 U.S. at 240, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." Here, Plaintiff's expression of concerns about improper handling of a DUI investigation to a law enforcement official outside his chain of command constitutes citizen speech on a matter of public concern.

106.     The Fourth Circuit has consistently held that public officials violate clearly established law when they retaliate against employees for speech about potential misconduct outside the chain of command. In *Durham*, 737 F.3d at 301-02, the court specifically held that speech outside an officer's chain of command regarding departmental misconduct was protected citizen speech.

107.     Fourth Circuit precedent has carefully distinguished between required employee speech within the chain of command (which may not be protected under *Garcetti*) and voluntary communications to external entities about matters of public concern. As noted in *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074-75 (9th Cir. 2013), which has been cited favorably in the Fourth Circuit, "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties."

108.     The Fourth Circuit has consistently held that speaking outside the chain of command about potential misconduct by supervisors constitutes protected citizen speech rather than employee speech. *See Durham*, 737 F.3d at 301-02 (finding

protected speech where officer reported departmental misconduct outside chain of command). Similarly, in *Hunter*, 789 F.3d 389, the Court held that officers who reported suspected corruption to the Governor's office were engaging in protected citizen speech, emphasizing that "speech about serious governmental misconduct" is a matter of significant public concern, particularly when it involves law enforcement agencies.

109.    On April 6, 2024, Plaintiff engaged in protected speech when he expressed concerns to Virginia State Trooper Marshall Brill about the handling of the April 5, 2024 incident involving Mr. Ortts. During this conversation, Plaintiff stated that he "didn't feel right about it" and explained the circumstances surrounding the investigation and the directives he had received from his supervisors.

110.    Plaintiff spoke as a citizen on a matter of public concern—potential impropriety in a law enforcement investigation—rather than pursuant to his official duties as a deputy sheriff. As the Supreme Court clarified in *Lane*, 573 U.S. at 240, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."

111.    Plaintiff's conversation with Trooper Brill occurred outside the chain of command and formal reporting structure of the Shenandoah County Sheriff's Office. This speech was not required as part of Plaintiff's job duties and was not the type of speech he was paid to produce or deliver. *See Durham*, 737 F.3d at 301-02 (finding that speech outside an officer's chain of command was protected).

112.    The potential improper handling of a DUI investigation by supervisory law enforcement officers is a matter of significant public concern, as it implicates public safety, equal application of the law, and the integrity of law enforcement. *See Lane*, 573 U.S. at 241 (recognizing that "corruption in a public program and misuse of state funds" are matters of public concern); *Durham*, 737 F.3d at 301-02 (holding that statements about law enforcement misconduct are matters of public concern).

113.    Plaintiff's conversation with Trooper Brill was clearly motivated by genuine concerns about law enforcement integrity and public safety, not personal employment issues.

114.    Plaintiff suffered adverse employment action in the form of suspension and termination. This adverse action was of a nature that would "deter... a person of ordinary firmness... from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ., 41*1 F.3d 474, 500 (4th Cir. 2005).

115.    The causal connection between Plaintiff's protected speech and his termination is conclusively established through Lieutenant Hall's explicit statement that Plaintiff's suspension was due to the fact that "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney." This direct acknowledgment provides compelling evidence of retaliatory motive, satisfying the causation element under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

116.    This causal connection is further strengthened by the timeline: no disciplinary action was contemplated during the two weeks between the April 5 incident and Plaintiff's protected speech to Trooper Brill on April 6. Only after Plaintiff engaged in protected speech and "the trooper went to the commonwealth attorney" did Defendant initiate adverse employment action, first suspending Plaintiff on April 19 and then terminating him on April 22.

117.    There was a causal connection between Plaintiff's protected speech and the adverse employment action, as evidenced by:

    a.  The temporal proximity between Plaintiff's conversation with Trooper Brill on April 6, 2024, and his suspension on April 19, 2024;

    b.  Lieutenant Bo Hall's explicit statement to Plaintiff that his suspension was due to the fact that "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney," directly connecting the suspension to Plaintiff's protected speech; and

    c. The lack of any contemporaneous documentation or investigation into the April 5, 2024 incident until after Plaintiff's conversation with Trooper Brill and the subsequent report to the Commonwealth Attorney's Office.

118.    Plaintiff's protected speech was a substantial or motivating factor in Defendant's decision to suspend and terminate him. *id*.

119.    Defendant cannot demonstrate that he would have taken the same action absent the protected speech, as evidenced by the lack of any disciplinary

proceedings before the protected speech and the disparate treatment between Plaintiff and his supervisors who did not engage in protected speech.

120.    Defendant cannot demonstrate that he would have taken the same adverse employment action against Plaintiff in the absence of his protected speech. This is evidenced by:

   a. The fact that no disciplinary action was contemplated or initiated against Plaintiff or his supervisors in the two weeks between the April 5, 2024 incident and Plaintiff's conversation with Trooper Brill;

   b. The disparate treatment of Sergeant Staffa and Master Deputy Hoover, who did not engage in similar protected speech and received only minor discipline despite their more significant roles in the incident; and

   c. The pretextual nature of the stated reasons for Plaintiff's termination, which focused on his purported misconduct in following supervisory directives rather than acknowledging the supervisors' responsibility for those directives.

121.    The actions of Defendant were undertaken under color of state law and pursuant to his authority as Sheriff of Shenandoah County.

121.    The Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification provides powerful independent evidence supporting the retaliatory nature of Defendant's actions. This specialized state agency, after a full evidentiary hearing examining the same conduct at issue in Plaintiff's termination, determined that Plaintiff's actions did

not warrant decertification. This determination by law enforcement experts directly contradicts Defendant's purported non-retaliatory basis for Plaintiff's termination and strongly supports the conclusion that Plaintiff's protected speech, not his conduct during the April 5-6 incident, was the true motivating factor for his termination.

122.     Defendant is not entitled to qualified immunity for this violation because the right of public employees to speak on matters of public concern without facing retaliation has been clearly established for decades. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick*, 461 U.S. 138; *Lane*, 573 U.S. 228.

123.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered substantial damages, including lost wages and benefits, emotional distress, damage to his professional reputation, and other consequential damages.

## COUNT II: VIOLATION OF DUE PROCESS - LIBERTY INTEREST (42 U.S.C. § 1983)

123.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124.     Plaintiff had a constitutionally protected liberty interest in his good name, reputation, honor, and integrity, and in his ability to pursue his chosen profession of law enforcement.

125.     The Supreme Court has long recognized that a person's reputation, good name, honor, and integrity are among the liberty interests protected by the Due Process Clause of the Fourteenth Amendment. *See Wisconsin v. Constantineau*,

400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

126.     The Fourth Circuit has established that a plaintiff claiming deprivation of a liberty interest in their reputation must show: (1) the stigmatizing statements were made in conjunction with a termination or significant demotion; (2) the statements were false; (3) the statements were made public; (4) the statements implicated the employee's competence as a professional; and (5) the charges were not subject to the requirements of a name-clearing hearing. *See Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006).

127.     Following *Sciolino v. City of Newport News*, a liberty interest claim in the Fourth Circuit requires proving the charges:

  a.  Placed a stigma on reputation;

  b.  Were made public by the employer;

  c. Were made in conjunction with termination or demotion; and

  d.  Were false.

128.     The Fourth Circuit has specifically recognized that selective omission of critical context—such as Defendant's failure to disclose that Plaintiff was following supervisory directives—can satisfy the falsity requirement of a liberty interest claim. *See Hall v. City of Newport News*, 469 F. App'x 259, 262-63 (4th Cir. 2012) and *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 502 (4th Cir.

2018) (recognizing that omitting crucial context can render statements false for liberty interest purposes when they lead to a misleading impression).

129.    As the Fourth Circuit has articulated, such a claim "arises from the combination of two distinct rights protected by the Fourteenth Amendment: (1) the liberty to engage in any of the common occupations of life and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."

130.    Defendant deprived Plaintiff of his liberty interest without due process by:

a.  Making false and defamatory statements about Plaintiff in connection with his termination, satisfying the "stigma-plus" test established in *Paul v. Davis*, 424 U.S. 693 (1976);

b.  Publishing these statements to the community through a press release and video statement that received over 7,400 documented views;

c. Characterizing Plaintiff's actions as "conduct unbecoming a law enforcement officer" and demonstrating "an inability and an unwillingness to uphold his sworn oath," despite knowing that Plaintiff was following supervisory directives;

d.  Selectively releasing body camera footage that presented an incomplete and misleading portrayal of events without the crucial context that Plaintiff was instructed by his supervisors to turn off his body camera and issue a lesser charge;

33

e. Deliberately omitting from all public statements the critical fact that Plaintiff was following supervisory directives; and

f. Failing to provide Plaintiff with a name-clearing hearing or other opportunity to contest these false assertions.

131.    Sheriff Carter's statements were demonstrably false. His assertion that Plaintiff demonstrated "an inability and unwillingness to uphold his sworn oath" directly contradicted the fact—known to Sheriff Carter—that Plaintiff was following supervisory directives pursuant to the department's chain of command policy. His characterization of Plaintiff's conduct as "unbecoming a law enforcement officer" was proven false by the Virginia Department of Criminal Justice Services' independent review and unanimous reinstatement decision, which necessarily determined that Plaintiff's conduct did not warrant decertification.

132.    These statements were made public through official channels, including a press release and video statement issued by the Sheriff's Office, ensuring widespread dissemination within the law enforcement community and general public.

133.    Defendant's statements directly implicated Plaintiff's professional competence and integrity as a law enforcement officer, questioning his fitness to serve in his chosen profession and portraying him as untrustworthy and derelict in his duties.

134.    A liberty interest claim is particularly appropriate where a "public employer [engages in] dissemination of false reasons for the employee's discharge without providing the employee notice and opportunity to be heard in order to clear his name." Here, Sheriff Carter's public statements prevented Plaintiff from "tak[ing] advantage of other employment opportunities" by harming his professional reputation without opportunity for a name-clearing hearing.

135.    Despite the serious and stigmatizing nature of these statements, Defendant provided Plaintiff with no opportunity for a name-clearing hearing to contest the false assertions about his professional conduct and character.

136.    Defendant's actions satisfy the "stigma-plus" test for liberty interest violations, as Defendant both stigmatized Plaintiff through false statements and deprived him of his government employment.

137.    The actions of Defendant were undertaken under color of state law and pursuant to his authority as Sheriff of Shenandoah County.

138.    The Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification following a full evidentiary hearing constitutes direct evidence of the falsity of Defendant's stigmatizing statements. This independent agency, composed of law enforcement experts tasked with evaluating officer conduct, necessarily determined that Plaintiff's actions did not constitute the "serious misconduct" alleged by Defendant, and that Plaintiff remained fit to serve as a law enforcement officer. This authoritative determination directly contradicts Defendant's published statements

characterizing Plaintiff's conduct as "unbecoming a law enforcement officer" and demonstrating "an inability and unwillingness to uphold his sworn oath."

139.    Defendant is not entitled to qualified immunity for this violation because the right to due process protection of liberty interests in reputation, particularly in the context of public employment termination accompanied by stigmatizing statements, has been clearly established in the Fourth Circuit and Supreme Court jurisprudence for decades.

140.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered substantial damages, including damage to his professional reputation, emotional distress, loss of career opportunities, and other consequential damages.

## COUNT III: VIOLATION OF PROCEDURAL DUE PROCESS - PROPERTY INTEREST (42 U.S.C. § 1983)

140.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

141.    At all relevant times, Plaintiff had a constitutionally protected property interest in his continued employment as a Deputy Sheriff with the Shenandoah County Sheriff's Office, created by specific departmental policies and statutory protections.

142.    While Virginia courts have generally held that deputy sheriffs serve at the will of the sheriff, Plaintiff's situation is distinguishable based on the specific policies and practices of the Shenandoah County Sheriff's Office that created a legitimate expectation of continued employment absent cause for termination. The

Supreme Court has recognized that even where state law suggests at-will employment, specific departmental policies and practices can create property interests in continued employment. *See Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972) (holding that a property interest can be created by "rules or mutually explicit understandings that support [a] claim of entitlement").

143.    The Sheriff's Office Standard Operating Procedure 2-5-H specifically states that "the conduct expected by all personnel is outlined in SOP 2-5-C; Code-of-Conduct" and that "discipline shall be applied to personnel with a clear indication it is being done to improve behavior or performance to acceptable standards." SOP 2-5-H further establishes that "except for gross misconduct, discipline should begin with first-line supervision taking the least formal measures such as counseling" and that "if not effective, then increasingly more severe measures may be required."

144.    These explicit provisions create a legitimate expectation that employees will not be terminated without first receiving progressive discipline, establishing more than a mere unilateral expectation of continued employment. As the Supreme Court recognized in *Perry*, 408 U.S. at 601-02, such "rules or mutually explicit understandings" can create constitutionally protected property interests even where state law suggests at-will employment.

145.    SOP 2-5-H establishes a detailed three-tier disciplinary system consisting of: (1) Commendations, (2) Intermediate Corrective Actions (including counseling, remedial training, and oral reprimands), and (3) Punitive Actions (including

written reprimands, suspension, demotion, disciplinary transfer, and termination). This structured progression creates a mutual understanding that termination will occur only after lesser measures have proven inadequate, except in cases of gross misconduct.

146.    SOP 2-5-H further requires supervisors to "treat personnel fairly and apply discipline consistently" and specifies that "disciplinary action shall always be appropriate to the circumstances." These provisions establish standards that constrain the Sheriff's discretion, creating reasonable expectations of procedural regularity and substantive fairness in the disciplinary process.

147.    Particularly significant is SOP 1-3, which explicitly requires that "All personnel shall promptly obey any lawful order of a supervisor" and warns that "Personnel refusing a lawful order can be subject to disciplinary action." These provisions create a reasonable expectation that personnel following supervisory directives would not be terminated for such compliance, especially when the supervisors giving the directives receive only minor discipline.

148.    The Sheriff's Office Standard Operating Procedures explicitly state that "employees shall only be subject to discipline for cause and following progressive discipline procedures set forth herein," language that creates protected expectations of continued employment absent cause. Such language establishes more than a mere unilateral expectation of continued employment; it creates a legitimate claim of entitlement protected by due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985).

149.    Additionally, the Sheriff's Office maintains a detailed progressive discipline policy that outlines specific infractions and corresponding disciplinary measures, further supporting the existence of a property interest in continued employment. This policy creates a system under which employees reasonably expect that discipline will be administered according to established guidelines rather than arbitrary discretion.

150.    As the Supreme Court established in *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972), property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Here, the Sheriff's Office policies and procedures created such "rules or understandings."

151.    Under U.S. Const. amend. XIV, Defendant could not deprive Plaintiff of his property interest in continued employment without due process of law.

152.    The constitutional adequacy of due process procedures must be evaluated under the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which requires consideration of: (1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used and the value of additional procedural safeguards; and (3) the government's interest.

153.    Plaintiff's interest in his continued employment, career advancement, and professional reputation is substantial, as demonstrated by his lost income, benefits, and diminished future employment opportunities.

154.    The risk of erroneous deprivation was exceptionally high due to Defendant's failure to provide adequate pre-termination procedures, Sheriff Carter's demonstrated bias against Plaintiff, and the summary nature of the termination decision without full consideration of all relevant evidence.

155.    Additional procedural safeguards—such as a neutral decision-maker, a meaningful pre-termination hearing, and consideration of the mitigating factor that Plaintiff was following supervisory directives—would have significantly reduced the risk of erroneous deprivation without imposing a substantial burden on governmental interests.

156.    Defendant deprived Plaintiff of his property interest without providing adequate procedural due process by:

a. Failing to give Plaintiff adequate notice of the specific allegations against him;

b. Failing to provide Plaintiff with a meaningful opportunity to respond to the allegations;

c. Conducting a perfunctory termination meeting that was not an opportunity to be heard;

d. Making the termination decision without consideration of Plaintiff's evidence and without consideration of all relevant evidence, including the fact that Plaintiff was following supervisory directives;

e. Imposing a disproportionate penalty compared to similarly situated employees; and

f. Failing to follow established Sheriff's Office procedures for progressive discipline.

157.    Courts have consistently found procedural due process violations under similar circumstances. *See Cleveland Bd. of Educ.*, 470 U.S. at 542 (finding that public employees must be afforded "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to termination); *Garraghty v. Jordan*, 830 F.2d 1295, 1299 (4th Cir. 1987) (finding that termination without adequate notice and opportunity to respond violated procedural due process); *Detweiler v. Va. Dep't of Rehab. Servs.*, 705 F.2d 557, 560 (4th Cir. 1983) (holding that due process requires "some kind of hearing" before discharge).

158.    The arbitrary nature of Plaintiff's termination is further demonstrated by the Virginia Department of Criminal Justice Services' decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing, necessarily finding that his conduct did not warrant such severe punishment.

159.    The actions of Defendant were undertaken under color of state law and pursuant to his authority as Sheriff of Shenandoah County.

160.    Defendant is not entitled to qualified immunity for this violation because the right to procedural due process prior to termination from public employment has been clearly established and no reasonable official could believe that terminating a deputy without adequate notice, a meaningful opportunity to

respond and be heard, and without consideration of exculpatory evidence comported with due process requirements.

161.    As a direct and proximate result of Defendant's actions, Plaintiff suffered substantial damages, including lost wages and benefits, emotional distress, damage to his professional reputation, and other consequential damages.

### COUNT IV: VIOLATION OF EQUAL PROTECTION (42 U.S.C. § 1983)

162.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

163.    U.S. Const. amend. XIV guarantees Plaintiff the right to equal protection of the laws, which prohibits the government from treating similarly situated individuals differently without adequate justification.

164.    This case presents a situation that falls outside the core concerns motivating the Engquist decision. Unlike the discretionary employment decisions addressed in Engquist that inherently involve "subjective and individualized" assessments, this case presents an objectively verifiable disparity where a subordinate officer was severely punished for following explicit supervisory directives while the supervisors who issued those directives received only minor discipline. This constitutes the rare situation where the governmental action is so arbitrary that it cannot be explained by any conceivable governmental purpose, precisely the standard that the Fourth Circuit has continued to recognize even post-Engquist. *See Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (recognizing class-of-one claims where there is "no rational basis for the difference in

treatment"); *see also Wilson v. Town of Mount Jackson*, No. ?DOCKET?, 2022 WL
17888670 (W.D. Va. Dec. 22, 2022) (noting that Engquist applies "most clearly in
the employment context" because such decisions are typically "subjective and
individualized").

165.    While the Supreme Court in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591
(2008), limited the application of class-of-one equal protection claims in the
context of routine discretionary employment decisions, this case falls outside those
limitations. Unlike the discretionary employment decisions addressed in
Engquist, this is not a case involving subjective criteria or routine personnel
matters. Rather, Plaintiff's termination for following explicit supervisory
directives—while those supervisors received minimal consequences—represents
an arbitrary governmental action that lacks any rational basis.

166.    While the Supreme Court in *Engquist*, 553 U.S. 591, limited class-of-one
equal protection claims in public employment, this case presents a situation
outside the core concerns that motivated the Engquist decision. As the Fourth
Circuit noted in Wilson v. Town of Mount Jackson (2022), Engquist applies "most
clearly in the employment context" precisely because employment decisions are
typically "subjective and individualized."

167.    This case differs fundamentally because it does not involve subjective
performance evaluations or discretionary personnel decisions. Rather, it presents
an objectively verifiable disparity where a subordinate officer was severely
punished for following supervisory directives while the supervisors who issued

those directives received only minor discipline for the same incident. This represents a rare case where the governmental action is so arbitrary that it cannot be explained by any conceivable legitimate purpose.

168.     Fourth Circuit precedent on disparate discipline supports this claim. As established in *Disher v. Weaver*, 308 F. Supp. 2d 614 (M.D.N.C. 2004), disparate discipline claims do not require precise equivalence in culpability but focus on whether the misconduct was of "comparable seriousness" while resulting in significantly different punishment. Here, the misconduct is not merely comparable—it is identical conduct viewed from different positions in the chain of command, with the difference being that Plaintiff was following orders while his supervisors were giving them.

169.     This situation creates an irreconcilable contradiction with SCSO's chain of command policy (SOP 1-3), which explicitly mandates that "All personnel shall promptly obey any lawful order of a supervisor" and warns that "Personnel refusing a lawful order can be subject to disciplinary action." Defendant's actions create a paradoxical situation where following orders leads to termination while issuing improper orders results in mere reprimands, undermining the entire rationale for chain of command in law enforcement.

170.     Defendant treated Plaintiff differently from similarly situated employees, specifically Sergeant Keith Staffa and Master Deputy Hank Hoover, who directed Plaintiff's actions during the April 5, 2024 incident.

171.    Sergeant Staffa and Master Deputy Hoover were similarly situated to Plaintiff in all relevant respects. All three were sworn law enforcement officers employed by the Shenandoah County Sheriff's Office who participated in the April 5, 2024 incident involving Mr. Ortts. All three were subject to the same professional standards, code of conduct, and disciplinary procedures.

172.    This case presents the rare situation where government action is so arbitrary that it cannot be explained by any government purpose other than animus or irrational decision-making. While Engquist generally limits class-of-one claims in the employment context, the fundamental rationale behind that limitation is that employment decisions typically involve "discretionary decision making based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603.

173.    Here, however, the treatment of Plaintiff involves no subjective assessment at all, but rather the objective application of the department's own policies regarding chain of command. When a subordinate officer is terminated for following orders pursuant to explicit policies requiring such compliance (SOP 1-3), while those who gave the improper orders receive minimal discipline, such disparate treatment creates a direct contradiction within the department's own standards that cannot be explained by any conceivable rational basis.

174.    Indeed, the supervisors held greater responsibility for the improper handling of the investigation, as they directed the specific actions for which Plaintiff was terminated:

45

a.  Master Deputy Hoover explicitly instructed Plaintiff to deactivate his body camera, stating "Cut it off" and confirming this instruction when Plaintiff sought clarification;

b.  Sergeant Staffa directed Plaintiff not to pursue a DUI charge despite evidence of intoxication above the legal limit, but instead to issue a citation for reckless driving; and

c. Sergeant Staffa instructed Plaintiff to destroy both copies of the summons and "be done with it" after discovering an incorrect code section had been used.

173.  Despite their greater culpability as the officers who issued the improper directives, Sergeant Staffa and Master Deputy Hoover received only minor discipline, while Plaintiff was terminated for following their orders as required by the department's chain of command policy.

174.  The arbitrary nature of Defendant's actions is demonstrated by the factual circumstances and is further confirmed by the Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing. This independent, specialized agency's unanimous rejection of Defendant's characterization of Plaintiff's conduct provides objective validation that the termination lacked any rational basis in accepted law enforcement standards or practices. The Executive Committee's determination necessarily concluded that Plaintiff's conduct in following supervisory directives did not warrant decertification or termination, directly

contradicting Defendant's purported rationale and confirming the arbitrary nature of the disparate treatment.

175.     The actions of Defendant were undertaken under color of state law and pursuant to his authority as Sheriff of Shenandoah County.

176.     Defendant is not entitled to qualified immunity for this violation because the prohibition against arbitrary and irrational government action that treats similarly situated individuals differently without justification is a clearly established principle of constitutional law.

177.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered substantial damages, including lost wages and benefits, emotional distress, damage to his professional reputation, and other consequential damages.

## COUNT V: DEFAMATION BY PUBLIC STATEMENTS

178.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

179.     Under Virginia law, defamation requires: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

180.     An actionable statement is both false and defamatory, meaning it "tends... to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977); *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713, 636 S.E.2d 447, 449 (2006).

181.    Defendant Carter made the following specific false and defamatory statements about Plaintiff in his May 7, 2024 press release and video statement:

a.  That Plaintiff made "no effort" to investigate the drunk driving incident, when in fact Plaintiff administered a PBT, determined the driver was over the legal limit, informed the driver of this fact multiple times, and intended to continue the DUI investigation before being instructed not to do so by his supervisors;

b.  That "the video was terminated after a brief communication with the driver," implying Plaintiff independently decided to deactivate his body camera, when in fact Plaintiff was explicitly directed by Master Deputy Hoover to "cut it off";

c.  That "the deputy made a decision to charge reckless driving," implying Plaintiff independently decided to issue a lesser charge, when in fact Plaintiff was directed by Sergeant Staffa to do so after being told that a DUI charge would not hold up in court;

d.  That Plaintiff's actions were "conduct unbecoming a law enforcement officer" and demonstrated "an inability and an unwillingness to uphold his sworn oath," when in fact Plaintiff was following the chain of command as required by his oath and departmental policy.

182.    These statements are demonstrably false. Defendant Carter was aware that Plaintiff had been following supervisory directives, as evidenced by:

a. Sheriff Carter's own investigation, which revealed that Master Deputy Hoover instructed Plaintiff to turn off his body camera;

b. The evidence that Sergeant Staffa directed Plaintiff not to pursue a DUI charge and later instructed him to destroy the summons;

c. Sheriff Carter's decision to discipline Sergeant Staffa and Master Deputy Hoover for their involvement in the incident, albeit to a lesser degree than Plaintiff, showing his awareness of their role in directing Plaintiff's actions;

d. The Shenandoah County Sheriff's Office Standard Operating Procedure 1-3, which Defendant Carter himself approved, that explicitly requires personnel to "promptly obey any lawful order of a supervisor."

183. By deliberately omitting this crucial context from his public statements, Defendant Carter created a false and misleading impression that Plaintiff had acted independently and improperly, rather than following supervisory directives as required by department policy. This selective omission of material facts transformed Defendant Carter's statements into defamatory falsehoods that directly damaged Plaintiff's professional reputation.

184. Defendant Carter possessed full knowledge that Plaintiff was following explicit supervisory directives when taking the actions for which he was terminated. This knowledge is conclusively demonstrated through multiple sources:

a. The body camera footage transcript explicitly shows Master Deputy Hoover instructing Plaintiff to deactivate his camera. The transcript records

Plaintiff asking "You cut yours off?" to which Hoover responds, "Cut it off, yeah." Plaintiff then sought confirmation, asking "Cut it off?" and Hoover confirmed, "Yes."

b.  Defendant's own SOP 1-3(IV)(A)(1) expressly requires that "All personnel shall promptly obey any lawful order of a supervisor," and establishes that "Personnel refusing a lawful order can be subject to disciplinary action." As the Sheriff who established these policies, Defendant cannot credibly claim ignorance of the requirement for subordinate officers to follow supervisory directives.

c.  In his May 7, 2024 public statement, Defendant acknowledged that "his supervisor told him that the code section on the summons that he had issued was not the proper code section that he was instructed to cite," explicitly recognizing that Plaintiff was acting under supervision.

d.  Defendant's decision to discipline Sergeant Staffa and Master Deputy Hoover, albeit to a lesser degree than Plaintiff, necessarily acknowledges their involvement in directing Plaintiff's actions. As established in Disher v. Weaver (2004), all officers in a department are considered similarly situated when evaluating discipline disparities, yet Defendant imposed drastically different discipline for conduct of "comparable seriousness."

e.  SCSO policy SOP 2-5-H requires that "disciplinary action shall always be appropriate to the circumstances" and that discipline should be applied consistently. These provisions underscore Defendant's obligation to

consider the supervisory directive context when determining appropriate discipline.

185.    These statements were factual in nature, capable of being proven true or false, and were actually false.

186.    These statements were false because Plaintiff was following the explicit directives of his supervisors as required by the Shenandoah County Sheriff's Office Standard Operating Procedures. Specifically:

a.    Defendant Carter falsely implied that Plaintiff independently "made a decision to charge reckless driving" and that the "field camera was cut off" by Plaintiff's own initiative, when in fact Plaintiff was explicitly directed by Master Deputy Hoover to turn off his camera and by Sergeant Staffa to issue only a reckless driving charge.

b.    Defendant Carter falsely stated that "no effort was made to investigate the drunk driving incident," when in fact Plaintiff had administered a PBT, determined the driver was over the legal limit, informed the driver of this fact multiple times, and intended to continue the DUI investigation before being instructed not to do so by his supervisors.

c.    Defendant Carter falsely characterized Plaintiff's conduct as "unbecoming a law enforcement officer" and demonstrating "an inability and an unwillingness to uphold his sworn oath," when in fact Plaintiff was following the chain of command as required by his oath and departmental policy.

187.    Through careful omission of critical facts and misleading characterization of the events, Defendant Carter created a false impression that Plaintiff independently decided to terminate the DUI investigation and destroy evidence, when in reality these actions were taken at the explicit direction of supervisors whom Plaintiff was obligated to obey.

188.    Despite this knowledge, Defendant deliberately excluded this crucial context from his public statements and DCJS decertification filing, creating the false impression that Plaintiff had acted independently rather than following the chain of command as required by SCSO policy. This deliberate omission demonstrates actual malice under Virginia defamation law, which defines actual malice as making statements "with knowledge that it was false or with reckless disregard for whether it was false or not."

189.    Defendant Carter published these false statements to third parties through:

    a.  A press release dated May 7, 2024, which was distributed to media outlets and posted on the Sheriff's Office website and social media accounts;

    b.  A video statement that received 7,406 documented views;

    c. The selective release of body camera footage that presented an incomplete and misleading portrayal of events, deliberately omitting the crucial context that Plaintiff was directed by his supervisors to turn off his body camera and issue a lesser charge.

190.    Virginia law distinguishes between defamation per se and defamation per quod. Defamation per se includes statements that impute to the plaintiff: (1) the commission of a crime involving moral turpitude; (2) infection with a contagious disease; (3) unfitness to perform the duties of an office or employment; or (4) lack of integrity or misconduct in office. *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632, 635 (1981); *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006).

191.    Defendant Carter's statements constitute defamation per se because they directly impute to Plaintiff unfitness to perform the duties of his employment as a law enforcement officer and misconduct in office.

192.    To the extent Plaintiff may be considered a public official for defamation purposes, Defendant Carter made these statements with "actual malice"—that is, with knowledge of their falsity or with reckless disregard for their truth or falsity—as required by *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) and its progeny.

193.    Defendant Carter knew these statements were false because he was aware that Plaintiff was following supervisory directives. This knowledge is demonstrated by:

   a. Sheriff Carter's own investigation, which revealed that Master Deputy Hoover instructed Plaintiff to turn off his body camera;

   b. The evidence that Sergeant Staffa directed Plaintiff not to pursue a DUI charge and later instructed him to destroy the summons;

c. Sheriff Carter's decision to discipline Sergeant Staffa and Master Deputy Hoover for their involvement in the incident, albeit to a lesser degree than Plaintiff, showing his awareness of their role in directing Plaintiff's actions.

194.    Alternatively, Defendant Carter made these statements with reckless disregard for their truth or falsity by:

a. Failing to conduct a thorough investigation before making public statements;

b. Deliberately omitting the crucial context that Plaintiff was following supervisory directives;

c. Selectively releasing only portions of the body camera footage that presented an incomplete and misleading portrayal of events; and

d. Disregarding evidence that contradicted his false narrative about Plaintiff's conduct.

195.    The Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing confirms the falsity of Defendant Carter's statements, as this independent review necessarily determined that Plaintiff's conduct did not warrant decertification.

196.    Defendant Carter's false statements prejudiced Plaintiff in his profession as a law enforcement officer by suggesting that he lacked integrity, was dishonest, and was unfit to serve as a law enforcement officer.

197.     As a direct and proximate result of Defendant Carter's defamatory statements, Plaintiff has suffered substantial damages, including damage to his professional reputation, emotional distress, loss of career opportunities, and other consequential damages.

## COUNT VI: DEFAMATION BY DECERTIFICATION FILING

198.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

199.     Under Virginia law, defamation requires: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Chapin*, 993 F.2d at 1092.

200.     An actionable statement is both false and defamatory, meaning it "tends... to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977); *Tronfeld*, 272 Va. at 713, 636 S.E.2d at 449.

201.     Defendant Carter made false and defamatory statements about Plaintiff in his April 23, 2024 Notification of Eligibility for Decertification (DC-1 form) submitted to the Virginia Department of Criminal Justice Services, and in the attached "Investigative Summary."

202.     Specifically, Defendant Carter made the following false and defamatory statements:

   a. "Unger's actions demonstrate that he is not committed to obeying the laws of the Commonwealth of Virginia."

b. "His actions in this incident do not uphold the public trust, in that he did not properly and fully investigate the incident of Driving Under the Influence and the crash as it relates to a later decision of Driving Reckless, to the point that Unger improperly destroyed records associated with this incident and there was absolutely no effort to follow through with the proper charge concerning the driver's actions."

c. "Unger's actions were unethical and do not adhere to the ethical standards for a law enforcement officer of this Office, nor the Commonwealth of Virginia."

d. "Unger's actions in this incident are conduct unbecoming of a law enforcement officer and demonstrate both, an inability and an unwillingness to uphold his sworn oath."

203. These statements were factual in nature, capable of being proven true or false, and were actually false.

204. These statements were false because Plaintiff was following the explicit directives of his supervisors as required by the Shenandoah County Sheriff's Office Standard Operating Procedures. Specifically:

a. Defendant Carter falsely stated that Plaintiff's actions demonstrated that he was "not committed to obeying the laws of the Commonwealth of Virginia," when in fact Plaintiff was following the directions of his supervisors, which he was required to do by department policy.

b. Defendant Carter falsely stated that Plaintiff "did not properly and fully investigate the incident of Driving Under the Influence," when in fact Plaintiff had administered a PBT, determined the driver was over the legal limit, informed the driver of this fact multiple times, and intended to continue the DUI investigation before being instructed not to do so by his supervisors.

c. Defendant Carter falsely stated that Plaintiff "improperly destroyed records associated with this incident," when in fact Plaintiff did so at the explicit direction of Sergeant Staffa, who assured him there would be no negative consequences.

d. Defendant Carter falsely characterized Plaintiff's actions as "unethical" and as demonstrating "an inability and an unwillingness to uphold his sworn oath," when in fact Plaintiff was following the chain of command as required by his oath and departmental policy.

205. Defendant Carter published these false statements to third parties by submitting them to the Virginia Department of Criminal Justice Services, where they were reviewed by multiple individuals within that agency and became part of Plaintiff's permanent record. The Virginia Department of Criminal Justice Services is not a court or judicial entity, and therefore these statements are not subject to absolute privilege.

206. Virginia law distinguishes between defamation per se and defamation per quod. Defamation per se includes statements that impute to the plaintiff: (1) the

commission of a crime involving moral turpitude; (2) infection with a contagious disease; (3) unfitness to perform the duties of an office or employment; or (4) lack of integrity or misconduct in office. *Fleming*, 221 Va. at 889, 275 S.E.2d at 635; *Tronfeld*, 272 Va. at 713, 636 S.E.2d at 449-50.

207.    Defendant Carter's statements constitute defamation per se because they directly impute to Plaintiff unfitness to perform the duties of his employment as a law enforcement officer, lack of integrity, and misconduct in office.

208.    To the extent Plaintiff may be considered a public official for defamation purposes, Defendant Carter made these statements with "actual malice"—that is, with knowledge of their falsity or with reckless disregard for their truth or falsity—as required by *N.Y. Times Co.*, 376 U.S. at 279-80.

209.    Defendant Carter knew these statements were false because he was aware that Plaintiff was following supervisory directives. If Defendant Carter was not aware of this fact at the time of his initial filing, he became aware of it during the investigation process, yet continued to maintain these false statements throughout the decertification proceedings.

210.    Defendant Carter made these statements with reckless disregard for their truth or falsity by:

   a. Failing to conduct a thorough investigation before submitting the decertification notification;

   b. Deliberately omitting the crucial context that Plaintiff was following supervisory directives;

    c. Characterizing Plaintiff's conduct in the harshest possible terms without acknowledging mitigating factors; and

    d. Disregarding evidence that contradicted his false narrative about Plaintiff's conduct.

211.     The Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing confirms the falsity of Defendant Carter's statements, as this independent review necessarily determined that Plaintiff's conduct did not warrant decertification.

212.     Defendant Carter's false statements directly harmed Plaintiff by causing his decertification as a law enforcement officer from May 10, 2024, until December 5, 2024, during which time he was unable to seek employment in his chosen profession.

213.     As a direct and proximate result of Defendant Carter's defamatory statements, Plaintiff has suffered substantial damages, including damage to his professional reputation, lost wages and benefits, emotional distress, loss of career opportunities, and other consequential damages.

## COUNT VII: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

214.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

215.     Under Virginia law, to establish a claim for tortious interference with business expectancy, a plaintiff must prove: "(1) the existence of a valid

contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Duggin v. Adams*, 234 Va. 221, 226, 360 S.E.2d 832, 835 (1987).

216. Additionally, when a plaintiff alleges interference with a business expectancy, rather than with an existing contract, the plaintiff must also allege that the defendant employed "improper methods." *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414, 493 S.E.2d 375, 378 (1997).

217. Improper methods include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," as well as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Duggin v. Adams*, 234 Va. 221, 227 (1987).

218. Methods may also be improper if they violate "an established standard of a trade or profession," or involve "[s]harp dealing, overreaching, or unfair competition." *Id.* at 227-28.

219. Improper methods can include "unethical conduct, unfair competition, sharp dealing, or overreaching" in addition to methods that are "illegal or independently tortious."

220.     Virginia law recognizes tortious interference claims even when the ultimate interference is unsuccessful, focusing on the improper methods employed rather than their effectiveness. As established in *Lewis-Gale Med. Ctr., L.L.C. v. Allredge*, 282 Va. 141, 149 (2011), methods of interference considered improper include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship."

221.     Following the reinstatement of his law enforcement certification on December 5, 2024, Plaintiff had a valid business expectancy in the form of employment with the Strasburg Police Department, as evidenced by his conditional offer of employment with a projected start date of January 13, 2025, and a specific starting salary of $24.58 per hour.

222.     This conditional offer created a reasonable probability of future economic benefit to Plaintiff, as it was a specific, concrete employment opportunity with defined terms and conditions.

223.     Defendant Carter knew of this business expectancy, as demonstrated by his actions to interfere with Plaintiff's employment at the Strasburg Police Department following the July 26, 2024 DCJS hearing.

224.     Defendant Carter intentionally interfered with this expectancy by contacting Strasburg Police Department Chief Wayne Sager regarding Plaintiff's potential employment.

225.     Defendant Carter's contact with Chief Sager during the first DCJS hearing

on July 26, 2024, constitutes evidence of Defendant's improper attempt to

interfere with Plaintiff's business expectancy. According to the Verified Case Fact

Sheet, Sheriff Carter observed Chief Sager attending the virtual hearing via Zoom

and specifically initiated contact to question his presence. When Chief Sager

explained that he believed "Jacob's a good kid" and intended to offer Plaintiff

employment if reinstated, Defendant Carter became noticeably "flustered,"

demonstrating Defendant's improper attempt to monitor and potentially influence

Plaintiff's employment prospects.

226.     Defendant Carter used improper methods in his interference, including:

a.  Abuse of his position as Sheriff to exert undue influence over another law

enforcement agency's hiring decisions;

b.  Making false and defamatory statements about Plaintiff's professional

competence and integrity by omitting the critical context that Plaintiff had

been following supervisory directives. As stated in *Foster v. Fraternal Order

of Eagles*, 108 Va. Cir. 409, 413 (Rockingham County Aug. 19, 2021),

"defamation constitutes an improper method" for tortious interference;

c. Misrepresentation and deceit, by presenting incomplete and misleading

information about the circumstances of Plaintiff's termination;

d.  Violating public policy embodied in the Virginia Whistleblower Protection

Act, which specifically prohibits retaliation against employees who report

potential violations of law to government officials. Va. Code Ann. § 40.1-

27.3 protects employees against retaliation for such disclosures, establishing a clear public policy that Defendant's interference attempts contravened;

e. Attempting to leverage his influence within the law enforcement community to prevent Plaintiff from obtaining employment;

f. Violating established standards of the law enforcement profession regarding inter-agency cooperation and professional courtesy; and

g. Engaging in conduct designed to punish Plaintiff for perceived disloyalty beyond the scope of legitimate professional concerns.

227. These improper methods go beyond legitimate competition or the exercise of legal rights. Rather, they constitute unethical conduct that exceeds the bounds of fair competition and professional conduct expected of law enforcement executives.

228. Defendant's improper interference attempt constitutes a compensable legal injury under Virginia law, regardless of whether it ultimately prevented Plaintiff's employment. Virginia courts recognize that tortious interference claims focus on the improper methods employed rather than their effectiveness, as established in *Lewis-Gale Med. Ctr., L.L.C.*, 282 Va. at 149. Here, Defendant's deliberate attempt to influence Plaintiff's employment prospects through improper methods constitutes an independently actionable wrong that caused Plaintiff to experience additional uncertainty about his professional future during a period when he was already vulnerable due to Defendant's prior retaliatory actions.

229.    Although Defendant Carter's tortious interference was ultimately unsuccessful in preventing Plaintiff's employment with the Strasburg Police Department, it caused Plaintiff significant professional uncertainty and emotional distress during the period between his receipt of a conditional offer and his start date.

230.    Defendant Carter's attempted interference has caused Plaintiff to suffer damages including:

    a.  Emotional distress from the uncertainty regarding his career prospects;

    b.  Continued damage to his professional reputation within the law enforcement community;

    c. Anxiety and stress during the pre-employment period; and

    d.  Ongoing professional consequences from Defendant Carter's attempts to damage Plaintiff's standing in the law enforcement community.

231.    Defendant Carter's improper attempt to influence Chief Sager regarding Plaintiff's potential employment demonstrates the continuation of Defendant's retaliatory campaign against Plaintiff beyond termination. This ongoing conduct further damaged Plaintiff's professional standing in the law enforcement community and compounded the emotional distress and reputational harm he had already suffered as a result of Defendant's prior actions.

232.    Defendant Carter's interference was intended to cause damage to Plaintiff and was undertaken with malice, warranting an award of punitive damages.

## COUNT VIII: WRONGFUL TERMINATION IN VIOLATION OF VIRGINIA PUBLIC POLICY

233.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

234.    Virginia recognizes a common law cause of action for wrongful termination where the termination violates a clear public policy of the Commonwealth. *See Bowman v. State Bank of Keysville*, 229 Va. 534, 540, 331 S.E.2d 797, 801 (1985); *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 102, 439 S.E.2d 328, 330 (1994).

235.    Although Virginia adheres to the employment-at-will doctrine, the Virginia Supreme Court has consistently recognized exceptions to the employment-at-will rule, including one for discharges that violate public policy. *VanBuren v. Grubb*, 284 Va. 584, 589, 733 S.E.2d 919, 921 (2012).

236.    Plaintiff's termination violated clear and specific public policies of the Commonwealth of Virginia that are explicitly expressed in state statutes, regulations, and established principles of professional responsibility in law enforcement.

237.    Va. Code Ann. § 15.2-1603 (2021) mandates that deputies "shall obey [the sheriff's] instructions" and creates the chain of command in sheriff's offices. This is not merely an internal management practice but a statutory requirement that establishes the public policy that subordinate officers must follow the directives of their superiors within the chain of command structure.

238.    This statutory mandate is further reinforced by Va. Code Ann. § 9.1-102(39) (2021), which authorizes the Criminal Justice Services Board to establish compulsory minimum standards for law enforcement officers, including requirements regarding chain of command and proper supervision within law enforcement agencies.

239.    The Virginia Criminal Justice Services Board has adopted regulations that require law enforcement agencies to maintain proper chain of command structures, creating an explicit public policy favoring adherence to supervisory directives in law enforcement agencies. See 6 VAC 20-80-40 (establishing minimum standards for law enforcement agencies that include personnel management practices).

240.    These statutory provisions and implementing regulations establish a clear public policy that subordinate officers must follow the directives of their superiors—a policy that is essential to the proper functioning of law enforcement agencies and the protection of public safety.

241.    Plaintiff was terminated for actions he took while adhering to this public policy—following the explicit directives of his supervisors, Sergeant Staffa and Master Deputy Hoover, regarding the April 5, 2024 incident.

242.    Plaintiff's adherence to the chain of command was not merely an internal disciplinary matter but rather the exercise of a right established by specific Virginia statutory law that directly relates to a matter of public policy.

243.    Terminating a subordinate officer for following supervisory directives, while imposing only minor discipline on the supervisors who issued those directives,

directly contravenes and undermines this important statutorily-established public policy.

244.     Virginia courts have recognized that when an employee is terminated for compliance with statutory requirements, such termination falls within the public policy exception to at-will employment.

245.     The Supreme Court of Virginia has held that termination based on an employee's refusal to violate the law or based on the employee's exercise of a statutorily-created right constitutes wrongful discharge in violation of public policy. Here, Plaintiff was terminated for exercising his statutorily-created obligation to follow the chain of command.

246.     The Virginia Department of Criminal Justice Services' decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing confirms that his termination violated public policy, as this independent review necessarily determined that his conduct in following supervisory directives did not warrant such severe punishment.

247.     Defendant's action in terminating Plaintiff for following the express directives of his supervisors constitutes wrongful termination in violation of Virginia public policy.

248.     As a direct and proximate result of Defendant's actions, Plaintiff suffered substantial damages, including lost wages and benefits, emotional distress, damage to his professional reputation, and other consequential damages.

## COUNT IX: WHISTLEBLOWER RETALIATION

249.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

250.    The Virginia Whistleblower Protection Act, Va. Code Ann. § 40.1-27.3(A), explicitly prohibits an employer from "discharg[ing], disciplin[ing], threaten[ing], discriminat[ing] against, or penaliz[ing] an employee" because the employee "in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official."

251.    Plaintiff engaged in protected whistleblowing activity when he reported concerns about potentially unlawful conduct during the April 5, 2024 incident to Virginia State Trooper Marshall Brill on April 6, 2024.

252.    Plaintiff's report to Trooper Brill involved the improper handling of a DUI investigation, including being instructed to deactivate his body camera, to issue a lesser charge despite evidence of intoxication above the legal limit, and subsequently being directed to destroy official documents.

253.    The statute specifically protects reports made to "any governmental body or law-enforcement official," with no limitation that such reports must be made within an employee's chain of command. Trooper Brill, as a Virginia State Trooper, clearly qualifies as a "law-enforcement official" under the statute. The law's broad protective scope intentionally provides multiple reporting channels for whistleblowers, recognizing that internal reporting may be ineffective when supervisors are implicated in the alleged violations.

254.    Plaintiff's report to Trooper Brill constituted a good faith report of a reasonable belief of a violation of law, rule, or regulation by law enforcement officials, which is protected whistleblowing activity under both federal common law and Virginia public policy.

255.    Plaintiff's report was made to an appropriate law enforcement official outside his direct chain of command after observing what he reasonably believed to be misconduct by his supervisors.

256.    Defendant was aware of Plaintiff's whistleblowing activity, as evidenced by Lieutenant Bo Hall's statement to Plaintiff that his suspension was due to the fact that "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney."

257.    Defendant took adverse employment action against Plaintiff by suspending him without pay on April 19, 2024, and terminating his employment on April 22, 2024.

258.    To establish a whistleblower retaliation claim under Virginia law, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendant took adverse action against him; and (3) there exists a causal connection between the protected activity and the adverse action. All three elements are clearly satisfied here.

259.    The causal connection is established through Lieutenant Hall's explicit statement that Plaintiff's suspension resulted because "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney." This direct

acknowledgment provides compelling evidence that Plaintiff's protected whistleblowing activity was a "substantial reason" for his termination, satisfying the causation requirement under Virginia law.

260.     There was a causal connection between Plaintiff's protected whistleblowing activity and the adverse employment actions, as demonstrated by:

   a. The temporal proximity between Plaintiff's report to Trooper Brill on April 6, 2024, and his suspension on April 19, 2024;

   b. The explicit acknowledgment by Lieutenant Hall that Plaintiff's suspension was linked to his communication with a state trooper; and

   c. The lack of any disciplinary action or investigation prior to Plaintiff's report to Trooper Brill.

261.     Defendant's stated reasons for Plaintiff's termination were pretextual, as evidenced by the disparate treatment of Sergeant Staffa and Master Deputy Hoover, who directed the very actions for which Plaintiff was terminated but received only minor discipline.

262.     The Virginia Department of Criminal Justice Services' unanimous decision to reinstate Plaintiff's law enforcement certification after a full evidentiary hearing further demonstrates the pretextual nature of Defendant's stated reasons for termination.

263.     As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered substantial damages, including lost wages and benefits, emotional distress, damage to his professional reputation, and other consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award the following relief:

1. Compensatory damages in an amount to be determined at trial, but not less than $500,000, representing:

   a. Lost wages from April 22, 2024, through his actual start date with the Strasburg Police Department on or about January 13, 2025;

   b. The difference between Plaintiff's salary as a Deputy Sheriff and his earnings from alternative employment during the relevant period;

   c. Legal expenses of at least $6,991.50 incurred in challenging his DCJS decertification;

   d. Emotional distress, anxiety, and professional uncertainty caused by Defendant's actions;

   e. Damage to professional reputation; and

   f. Other consequential damages proven at trial.

2. Punitive damages against Defendant Carter in his individual capacity in an amount to be determined at trial, but not to exceed $350,000, based on his willful, malicious, and reckless disregard for Plaintiff's constitutional and state law rights;

3. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, which provides that in actions brought under 42 U.S.C. § 1983, "the court, in its

71

discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs";

4. Declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, declaring that:

   a. Defendant violated Plaintiff's First Amendment rights by retaliating against him for engaging in protected speech outside his chain of command regarding matters of public concern;

   b. Defendant violated Plaintiff's liberty interest protected by the Due Process Clause of the Fourteenth Amendment by making false, stigmatizing statements about him in connection with his termination without providing a name-clearing hearing;

   c. Defendant violated Plaintiff's property interest protected by the Due Process Clause of the Fourteenth Amendment by terminating his employment without adequate pre-termination procedures;

   d. Defendant violated Plaintiff's equal protection rights under the Fourteenth Amendment by treating him arbitrarily and irrationally compared to similarly situated employees;

   e. Defendant Carter's public statements and decertification filing about Plaintiff were false and defamatory, made with actual malice; and

   f. Defendant retaliated against Plaintiff for protected whistleblowing activity;

5. Pre-judgment interest on all damages awards at the statutory rate;

6. Post-judgment interest as allowed by 28 U.S.C. § 1961; and

7. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to

Fed. R. Civ. P. 38(b).

Respectfully submitted,

_____/s_____

Elliott M. Harding, Esq.
Virginia State Bar No. 90442
*Counsel for Plaintiff Jacob T. Unger*
HARDING COUNSEL, PLLC
2805 Meadow Vista Dr.
Charlottesville, Virginia 22901
Telephone: 434-962-8465
Email: Elliott@HardingCounsel.com