CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 28, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

Jacob T. Unger,                              )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )        Civil Action No. 5:25-cv-00029
                                             )
Timothy C. Carter,                           )
                                             )
            Defendant.                       )

## MEMORANDUM OPINION

This matter is before the court on Defendant Timothy C. Carter's motion to dismiss. (Dkt. 6.) For the reasons set forth below, the court will grant in part and deny in part the motion.

## I.    Background

### A. Factual History

The facts in this section are taken from the complaint and are accepted as true when resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff Jacob T. Unger was hired as a deputy sheriff by the Shenandoah County Sheriff's Office ("SCSO") in December 2021. (Compl. ¶ 17 (Dkt. 1).) On April 5, 2024, Unger responded to a motor vehicle crash along with Master Deputy Hank Hoover. (*Id.* ¶¶ 22–23.) Upon arrival, they discovered a pickup truck crashed into a barn structure. (*Id.* ¶ 23.) The driver, Kyle Ortts, met the officers in a nearby field. (*Id.* ¶ 24.) Unger recognized

Ortts as having attended the same high school a decade earlier. (*Id.*) While Unger was familiar with Ortts, the two were merely acquaintances without any significant relationship. (*Id.*)

During his initial assessment of Ortts, Unger noticed no signs of alcohol impairment. (*Id.* ¶ 25.) After conveying this assessment to Hoover, Hoover suggested that Unger administer a Preliminary Breath Test ("PBT") to "just see where he is at." (*Id.* ¶ 26.) Unger activated his body camera in accordance with the SCSO Standard Operating Procedures ("SOP"), which require deputies to activate their cameras as soon as possible to record activity related to law-enforcement incidents in the field. (*Id.* ¶ 27.) The PBT indicated a blood alcohol content of 0.098, above the legal limit of 0.08. (*Id.* ¶ 29.)

After informing Ortts that he was above the legal limit for operating a motor vehicle, Unger intended to continue the DUI investigation, which would normally include administering standardized field sobriety tests and a potential arrest. (*Id.* ¶¶ 30–31.) However, before Unger could proceed, Hoover intervened, instructing Unger to disable his body camera. (*Id.* ¶ 32.) Following this instruction, Unger asked Hoover if he had cut his camera off, to which Hoover replied, "Cut it off, yeah." (*Id.*) Again, Unger asked, "Cut it off?" to confirm the instruction, and Hoover confirmed, "Yes." (*Id.* ¶ 33.) Following this directive, Unger deactivated his body camera. (*Id.* ¶ 37.)

Following the deactivation of the body cameras, Sergeant Keith Staffa arrived at the scene. (*Id.* ¶ 38.) After speaking with Unger, Staffa informed him that that he had "screwed up" the DUI investigation by conducting the PBT before the field sobriety tests. (*Id.*) Staffa advised Unger that the DUI charge would not hold up in court and instructed him to not pursue the DUI charge. (*Id.* ¶¶ 38–39.) Instead, Unger was instructed to issue a citation for

reckless driving.  (*Id.* ¶ 39.)  Unger complied with this directive and issued Ortts a summons for reckless driving.  (*Id.* ¶ 40.)

The next day, April 6, 2024, Unger encountered Virginia State Trooper Marshall Brill while refueling his patrol vehicle.  (*Id.* ¶ 49.)  During a conversation with Trooper Brill, Unger "expressed concerns" about how the incident with Ortts had been handled the night before.  (*Id.* ¶ 50.)  Specifically, Unger informed Trooper Brill that he "didn't feel right about it."  (*Id.*)  Following their conversation, Unger believes that Trooper Brill reported these concerns to the Commonwealth Attorney's Office ("CAO").  (*Id.* ¶ 54.)

Later that same day, Staffa contacted Unger and instructed him to come to the office immediately to discuss the summons Unger had issued to Ortts.  (*Id.* ¶ 40.)[1]  During this meeting, Staffa informed Unger that the summons he issued contained the incorrect code section and presented him with two options: (1) Take the summons to a magistrate, seek the proper charge, serve Ortts, and keep copies for the front office; or (2) Take both copies of the original summons (including the one already served on Ortts) and shred them, whereby no one "has to go to court, and no one will be charged."  (*Id.* ¶ 41.)  Staffa also stated: "I am not telling you what to do," but implied the second option is what he would do.  (*Id.* ¶ 42.)  Unger asked if he would face any consequences for destroying the summons, and Staffa assured him: "No, nothing will come back on you.  It is handled and dealt with, you have nothing to worry about."  (*Id.* ¶ 43.)  Hoover, who was present during this conversation, initially expressed concern about destroying the summons, but eventually stated: "Alright, Unger just shred it I guess."  (*Id.* ¶ 44.)

---

[1] Unger's complaint contains two paragraphs numbered "40."  This fact references the second Paragraph 40.

Shortly after that meeting, Unger contacted Ortts and arranged for him to come to the SCSO the same day. (*Id.* ¶¶ 45–46.) Unger met Ortts in the parking lot and was captured on the building's surveillance cameras. (*Id.* ¶ 46.) Unger explained to Ortts that there had been an issue with the code section, retrieved Ortt's copy of the summons, and told Ortts that he would not need to appear in court. (*Id.* ¶ 47.) With both copies of the summonses in hand, Unger destroyed them. (*Id.* ¶ 48.)

About two weeks later, on April 19, 2024, Unger received a phone call from Lieutenant Bo Hall informing him that he was being placed on administrative suspension without pay, effective immediately, pending an investigation of the April 5 incident. (*Id.* ¶ 54.)[2] During the call, Hall informed Unger that "someone ran their mouth to a state trooper and the trooper went to the commonwealth attorney." (*Id.* ¶ 55.) Unger surrendered his badge, service weapon, and other department equipment. (*Id.* ¶ 57.)

Three days later, on April 22, 2024, Unger attended a meeting with Carter, Captain Glenn Ogle, and Major Kolter Stroop. (*Id.* ¶ 58.) There, Unger was questioned about the April 5 incident and his relationship with Ortts. (*Id.* ¶ 59.) Unger explained that he was not friends with Ortts and that he was following his supervisors' instructions. (*Id.* ¶¶ 59–60.) At that point, however, Carter became angry and showed Unger surveillance video of his April 6 meeting with Ortts in the SCSO parking lot. (*Id.* ¶ 60.) While showing the video, Carter stated: "So you're not good friends with him, well watch this look you pat him on the back twice and

---

[2] Unger's complaint contains two paragraphs numbered "54." This fact references the second Paragraph 54.

then fist bump him and shakes his hand." (*Id.*) After accusing Unger of dishonesty, Carter

handed Unger a termination later, which stated in part:

> Your actions demonstrate that you are not committed to obeying the laws of
> the Commonwealth of Virginia. Your actions in this incident do not uphold the
> public trust, in that you did not properly and fully investigate the incident of
> Driving Under the Influence, and the crash as it relates to a later decision of
> Driving Reckless, to the point that you improperly destroyed records associated
> with this incident and there was absolutely no effort to follow through with the
> proper charge concerning the driver's actions. Lastly, your actions were
> unethical and do not adhere to the ethical standards for a law enforcement
> officer of this Office, nor the Commonwealth of Virginia.
>
> Your actions in this incident are conduct unbecoming a law enforcement officer
> and demonstrate both, an inability and an unwillingness to uphold your sworn
> oath.

(*Id.* ¶ 62.)

> After presenting Unger with the termination letter, Carter stated:
>
> You are fucking fired, get the fuck out of my office. I swear to God Jacob if
> you talk to any of your family and friends about this or anything bad about this
> office, I swear to god I will post these videos on social media and have your
> [sic] exposed. Now get the fuck out of my office.

(*Id.* ¶ 63.) While Unger was terminated, the supervising officers that were present at the scene

on April 5, Staffa and Hoover, received only minor discipline.[3] (*Id.* ¶ 66.)

Fifteen days later, on May 7, 2024, Carter issued a press release and video statement on

YouTube regarding Unger's termination. (*Id.* ¶ 67.) In the video statement, Carter stated:

> On the 19th of April 2024, I became aware of an incident that occurred on the
> 5th of April 2024, which a deputy sheriff was called to investigate a motor
> vehicle crash. After reviewing the incident, even though the driver admitted to
> consuming alcohol at least four times and having crashed into a structure, no
> effort was made to investigate the drunk driving incident.

---

[3] The specifics surrounding the disciplinary actions taken against Staffa and Hoover are not included in the complaint.

The body field camera video associated with this crash is linked to this release. It shows that the deputy had Reasonable Suspicion to investigate the potential crime, but the video was terminated after a brief communication with the driver and after the deputy performed a preliminary breath test or PBT, which also indicated that the driver had potentially consumed alcohol prior to the crash.

The driver asked the deputy what the PBT showed, which it showed a 0.098 blood alcohol content, and the driver was told that he was over the legal limit and driving intoxicated at least five times by the deputy.

The investigating Deputy approached another Patrol deputy and later the deputy approached a supervisor, and the field camera was cut off. The deputy made a decision to charge reckless driving and was instructed the proper code section for this violation.

The summons was issued and the adult driver was allowed to leave with a sober driver. The next day, the deputy was notified by his Patrol sergeant that the code section on the summons that he had issued was not the proper code section that he was instructed to cite. His supervisor told him that he could destroy the summons and go before a magistrate to obtain a summons with the proper charge, but also could destroy the summons since the man had not gone before the court.

The deputy contacted the driver and had him return his copy of the summons. There is a video of this exchange linked to this release. You may also notice that the deputy offered and received a fist bump with the driver as he left the Sheriff's Office.

On the 22nd of April, I terminated the deputy's appointment to this office. His actions in this incident are conduct unbecoming a law enforcement officer and demonstrated both an inability and an unwillingness to uphold his sworn oath.

(*Id.* ¶ 68.)

Following Unger's termination, Carter submitted a Notification for Decertification to the Virginia Department of Criminal Justice Services ("DCJS"), seeking to have Unger decertified as a law enforcement officer.  (*Id.* ¶ 76.)  In his submission, Carter characterized Unger's conduct as "serious misconduct" warranting decertification under Virginia Code § 15.2-1707(B)(iv).  (*Id.* ¶ 77.)  Carter also included an "Investigative Summary," which stated:

> Unger's actions demonstrate that he is not committed to obeying the laws of
> the Commonwealth of Virginia. His actions in this incident do not uphold the
> public trust, in that he did not properly and fully investigate the incident of
> Driving Under the Influence and the crash as it relates to a later decision of
> Driving Reckless, to the point that Unger improperly destroyed records
> associated with this incident and there was absolutely no effort to follow
> through with the proper charge concerning the driver's actions. Lastly, Unger's
> actions were unethical and do not adhere to the ethical standards for a law
> enforcement officer of this Office, nor the Commonwealth of Virginia.
>
> Unger's actions in this incident are conduct unbecoming of a law enforcement
> officer and demonstrate both, an inability and an unwillingness to uphold his
> sworn oath.

(*Id.* ¶ 78.)  On May 10, 2024, DCJS decertified Unger as a law enforcement officer.  (*Id.* ¶ 80.)

In response to his decertification, Unger filed an appeal.  (*Id.* ¶ 81.)  On July 26, 2024,
DCJS held a public hearing.  (*Id.* ¶ 82.)  While at the hearing, Carter noticed that Strasburg
Police Chief Wayne Sager was attending via Zoom.  (*Id.* ¶ 83.)  Carter later contacted Chief
Sager and questioned why he was in attendance.  (*Id.*)  Chief Sager explained that he believed
"Jacob's a good kid" and that if Unger was reinstated, he would likely offer him a job.  (*Id.*
¶ 84.)  During this call, Carter became noticeably flustered.  (*Id.*)

Months later, DCJS conducted an additional hearing on November 21, 2024.  (*Id.* ¶ 86.)
At the hearing, both Unger and the SCSO presented evidence and testimony.  (*Id.*)  Ultimately,
the DCJS voted unanimously to reinstate Unger's certification.  (*Id.* ¶ 87.)  Shortly thereafter,
Unger received an offer of employment from the Strasburg Police Department ("SPD") with
a start date of January 13, 2025.  (*Id.* ¶ 91.)

**B. Procedural History**

Unger filed this action on April 1, 2025.  (Compl.)  Unger's complaint contains nine
claims.  Count I is for First Amendment retaliation under 42 U.S.C. § 1983.  (*Id.* ¶¶ 101–23.)

Counts II and III are for violations of due process affecting a liberty interest and property interest under 42 U.S.C. § 1983. (*Id.* ¶¶ 123–40, 140–61.) Count IV is for violation of equal protection under 42 U.S.C. § 1983. (*Id.* ¶¶ 162–77.) Counts V and VI are for defamation by public statements and by the DCJS decertification statement. (*Id.* ¶¶ 178–97, 198–213.) Count VII is for tortious interference with a business expectancy. (*Id.* ¶¶ 214–32.) Count VIII is for wrongful termination in violation of Virginia public policy. (*Id.* ¶¶ 233–48.) Count IX is for whistleblower retaliation under Va. Code Ann. § 40.1-27.3(A). (*Id.* ¶¶ 249–63.)

On May 14, 2025, Carter moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. 6.) Carter also filed a memorandum in support of the same. (Def.'s Mem. in Supp. of his Mot. to Dismiss (Dkt. 7) [hereinafter "Carter Mem."].) Unger filed a response in opposition on May 28, 2025. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss (Dkt. 9) [hereinafter "Unger Resp."].) Finally, Carter replied on June 4, 2025. (Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss (Dkt. 10.) [hereinafter "Carter Reply"].)

A hearing on the motion was held on July 23, 2025. (Dkt. 12.)

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616.

### III.    Analysis

### A.  Count I: First Amendment Retaliation (42 U.S.C. § 1983)

Unger asserts a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983. (*See* Compl. ¶¶ 101–23.) He claims that his conversation with Trooper Brill constituted protected speech and was the but-for cause of his termination. (*See id.* ¶¶ 105–20.)

When a government employee claims that he was disciplined because of First Amendment activity, the plaintiff must show: "(1) that he was a 'public employee . . . speaking as a citizen upon a matter of public concern [rather than] as an employee about a matter of personal interest;' (2) that his 'interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public;' and (3) that his 'speech was a substantial factor in the employer's termination decision.'" *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 342 (4th Cir. 2017) (quoting *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998)). Carter contests the final prong, related to causation. (*See* Carter Mem. at 6.)

In order to establish causation, "a plaintiff must show 'at the very least[] that the defendant was aware of [plaintiff's] engaging in protected activity,' and 'some degree of

temporal proximity."' *Williams v. Mitchell*, 122 F.4th 85, 89 (4th Cir. 2024) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)).  Carter does not appear to dispute that the thirteen-day period between Unger's conversation with Trooper Brill and his suspension shows some degree of temporal proximity.  (*See* Carter Mem. at 6.)  However, Carter claims that "the complaint fails to establish that Sheriff Carter was aware of Unger's purported protected speech at the time of Unger's termination."  (*Id.*)  In other words, the complaint, according to Carter, fails to allege that he was aware that it was Unger who spoke to Trooper Brill.

Unger counters by asserting multiple theories of causation.  (Unger Resp. at 13–15.)  First, Unger claims that the complaint provides direct evidence of causation—linking Unger's protected speech to Trooper Brill with his suspension through Hall's comment.  Recall that Hall, who informed Unger of his suspension, stated that Unger was being suspended because "*someone* ran their mouth to a state trooper and that trooper went to the commonwealth attorney."  (*Id.* at 13 (quoting Compl. ¶ 55 (emphasis added)).)  Unger asserts that it is a reasonable inference that Carter, as the ultimate decisionmaker who terminated Unger three days after the suspension, "was aware of the reason for the suspension he had authorized."  (*Id.*)  According to Unger, "[i]t would be implausible for a sheriff to terminate a deputy without knowing the basis for the ongoing suspension."  (*Id.*)

Unger's arguments for a direct causation theory fail.  Nowhere in the complaint does Unger allege that Carter was ever informed that Unger was the source of the information conveyed to the CAO as opposed to another person.  There are also no facts alleging that Hall knew that it was Unger who spoke with Trooper Brill.  And there are no allegations in the

complaint that Trooper Brill specifically identified Unger by name in any conversation with the CAO. As a result, no facts in the complaint allege that Carter was aware of Unger's constitutionally protected activity of speaking with Trooper Brill.

Second, Unger points to the temporal proximity between his conversation with Trooper Brill and his suspension thirteen days later as "powerful[]" evidence of a causal connection. (Unger Resp. at 13–14.) But Carter does not appear to dispute the temporal proximity between Unger's speech and his later suspension. Carter instead argues that temporal proximity alone is insufficient to establish causation. (Carter Reply at 2.) The court agrees. "In order to establish this causal connection, a plaintiff in a retaliation case must show, *at the very least*, that the defendant was aware of [his or] her engaging in protected activity." *Constantine*, 411 F.3d at 501 (citation omitted) (emphasis added). Without alleging whatsoever that Carter was aware of Unger's conversation with Trooper Brill, Unger's First Amendment retaliation claim fails as a matter of law.[4] Accordingly, the court will grant Carter's motion to dismiss Count I. Count I will be dismissed without prejudice.

## B. Count II: Violation of Due Process – Liberty Interest (42 U.S.C. § 1983)

Unger's second count asserts deprivation of a liberty interest pursuant to 42 U.S.C. § 1983. (*See* Compl. ¶¶ 123–40.) Unger alleges that through his public statements and submissions to the DCJS, Carter significantly damaged Unger's reputation and deprived him of his ability to pursue a career in law enforcement. (*Id.*)

---

[4] Unger also discusses the "Cat's Paw Theory of Liability" as another argument in favor of causation. (*See* Unger Resp. at 14–15.) This theory concerns cases where a supervisor acts with retaliatory animus and causes the plaintiff's termination by a third party. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Unger also cites the lesser discipline received by his two supervisors as further evidence of retaliatory motivation. (*See* Unger Resp. at 15.) Neither of these arguments are supported by adequate facts in Unger's complaint. As a result, the court declines to discuss them in-depth in this opinion.

Due process must be provided before someone is deprived of a liberty interest. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). To successfully bring a liberty interest claim, a plaintiff must show that the defendant's statements: "(1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007). Carter does not contest the second prong, but he asserts that the other three prongs of the test are not met. (*See* Carter Mem. at 8–9.) However, because Unger's complaint fails to plausibly allege the third prong the court begins and ends its analysis there.

Carter argues that his statements were not made "in conjunction with" Unger's termination. (*See id.* at 8–9.) Carter's sole case supporting his position that statements made after the termination decision are not "in conjunction with" the termination is *Moschetti v. Nixon Peabody, LLP*, 3:23-cv-389, 2024 WL 2750010, at *9 (E.D. Va. May 29, 2024) (statements made two months after termination did not satisfy the third prong of a liberty interest claim).[5] Unger, on the other hand, offers no specific caselaw. Instead, he claims without support that Carter's argument "ignores Fourth Circuit precedent recognizing that stigmatizing statements need not occur simultaneously with termination" and that "[c]ourts examine whether the statements form part of a continuous course of conduct related to and elaborating upon the

---

[5] While Carter's description of *Moschetti* is not untrue, it suggests that the timing of the statements was dispositive. However, the plaintiff's liberty deprivation in *Moschetti* was also defective for additional reasons, such as failing to rise to the necessary level of stigmatizing or demonstrating a lack of due process. *See Moschetti*, 2024 WL 2750010, at *9–10.

termination." (Unger Resp. at 18.) Unger has not informed the court what the Fourth Circuit precedent might be.

"In conjunction with" does not require the plaintiff's termination and the defendant's statements to occur simultaneously. As other courts have identified, there is no bright-line rule establishing how close in proximity the events must be. *See Flanagan v. Scearce*, No. 7:19-CV-00413, 2021 WL 4312555, at *11–13 (W.D. Va. Sept. 22, 2021) ("*Sciolino* itself is not clear as to what 'in conjunction' exactly means, but other caselaw suggests that the statements must be made either concurrently or in very close proximity with the termination."). Courts have consistently held a period of approximately two months or more is insufficient. *See, e.g., id.* at *12 (holding that six weeks was too great); *Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331, 359 (D. Md. 2011) (holding that a two-month gap failed to meet the standard). But a period of one week or less has been found to be sufficient. *See Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004) ("[W]e are nonetheless confident that . . . , where some of the statements were made within one week of plaintiff's termination, and were made in direct response to requests for reasons for plaintiff's termination, that the proper nexus exists . . . ."); *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) ("[P]ublication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment. That the allegedly defamatory statements occurred several days following the announcement of Plaintiff's termination does not, of itself, defeat his claim.").

The Fourth Circuit instructs "that, in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be 'made in the course of a discharge or

significant demotion.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)).  It is not enough that the defamatory act takes place shortly after the plaintiff's termination.  Rather, the standard has remained that "the defamation ha[s] to occur *in the course of* the termination of employment." *Paul v. Davis*, 424 U.S. 693, 710 (1976) (emphasis added); *see also Hamilton*, 807 F. Supp. at 357 ("Thus, there must be a '*concurrent temporal link*' between the defamation and the dismissal.'") (quoting *Martz v. Incorp. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994)) (emphasis added).

Here, the temporal proximity of fifteen days is longer than periods accepted by other courts.  Despite claiming to the contrary, Unger has produced no support for the proposition that a period of more than two weeks can satisfy the concurrent temporal link required for this claim.  The court finds that Unger did not sufficiently allege that Carter's series of statements were made "in conjunction with" or "in the course of" Unger's termination.  That is, Unger fails to allege sufficient facts to give rise to a plausible inference that satisfies the "in conjunction with" element of the test from *Sciolino*.  Accordingly, Carter's motion to dismiss Count II will be granted. Count II will be dismissed without prejudice.

## C. Count III: Violation of Procedural Due Process – Property Interest (42 U.S.C. § 1983)

Unger's third count is for violation of procedural due process affecting a constitutionally protected property interest pursuant to 42 U.S.C. § 1983.  (*See* Compl. ¶¶ 140–61.)  Unger alleges that the disciplinary procedures set forth in the SOP created an expectation of continued employment, despite Virginia's at-will employment laws.  (*See id.* ¶¶ 142–49.)

Carter disagrees, arguing that due to Virginia's employment-at-will laws, no such property interest exists.[6] (*See* Carter Mem. at 9–10.)

The SOP, an internal set of policies followed by the SCSO, impose a range of requirements for officers and procedures outlining what disciplinary actions are taken and when. (*See* Compl. ¶¶ 143–49.) They detail a three-tier disciplinary system, with termination being the most extreme and final outcome. (*See id.* ¶¶ 145–46, 148–49.) Unger asserts that these procedures create a reasonable expectation that officers will not be terminated without at least some prior notice or lesser reprimand. (*See id.* at ¶¶ 145, 149.)

However, sheriff's deputies in the state of Virginia have no protectible property interests in continued employment. To establish a protected property interest, state law governs, and understandings must provide a "sufficient expectancy of continued employment." *Jenkins v. Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990). Virginia law states that deputies are appointed and removed at the discretion of the sheriff. *See* Va. Code Ann. § 15.2-1603 ("Any such deputy may be removed from office by his principal."). The Fourth Circuit has affirmed that as at-will employees serving at the discretion of a sheriff, deputies have no protectible property interest in continued employment. *See Jenkins*, 909 F.2d at 107 ("A local government employee serving 'at the will and pleasure' of the government employer has no legitimate expectancy of continued employment and thus has no protectible property interest.").

---

[6] Carter also raises a qualified immunity defense against Count III. (Carter Mem. at 10.) Because Count III will be dismissed on other grounds, the court will not analyze this defense. *See Warner v. Doucette*, No. 6:18-cv-00064, 2019 WL 3432744 at *6 n.6 (W.D. Va. July 30, 2019) (declining to analyze defendant's qualified immunity defense due to the claim being dismissed on other grounds).

In *Jenkins*, a sheriff's deputy filed a 42 U.S.C. § 1983 claim against his former employer for deprivation of property interest. *Id.* at 106. Like Unger, the deputy was terminated without notice or formal hearing. *Id.* Also like Unger, the deputy pointed to the office's employee handbook to prove his lack of due process. *Id.* Despite the discrepancies between the procedures laid out in the handbook and the deputy's termination, the court held that nothing superseded the fact that he was an at-will employee per state law. *Id.* at 108–10; *see also Hutto v. Waters,* 552 F.Supp. 266, 269 (E.D. Va. 1982) (holding that the policies of the sheriff's department, which provided for notice and an opportunity to be heard prior to dismissal, were "insufficient to negate the fact that a deputy sheriff holds his position at the will of the sheriff and can be dismissed without any constitutionally mandated procedural protections").

The complaint's allegations that the SOP created a protectible property interest fail when confronted with state law and court precedent. Accordingly, Carter's motion to dismiss Count III will be granted. Count III will be dismissed with prejudice.

## D. Count IV: Violation of Equal Protection (42 U.S.C. § 1983)

Unger's fourth claim is for violation of Equal Protection under 42 U.S.C. § 1983. (*See* Compl. ¶¶ 162–77.) Unger claims that through imposing a harsher punishment onto Unger than the supervisors who instructed him, Carter engaged in disparate discipline. (*See id.* ¶¶ 167–77.) In his motion to dismiss, Carter argues that the complaint fails to state a violation of Equal Protection because Unger's "class of one" argument does not apply to government employees.[7] (*See* Carter Mem. at 10–11.)

---

[7] Carter also raises a qualified immunity defense against Count IV. (Carter Mem. at 11.) Because Count IV will be dismissed on other grounds, the court will not analyze this defense. *See Warner*, 2019 WL 3432744 at *6 n.6.

"Class of one" equal protection claims require a plaintiff to show that "highly similar comparators received better treatment" for no rational reason.  *See SAS Assocs. 1, LLC v. City Council for City of Chesapeake, Va.*, 91 F.4th 715, 723 (4th Cir. 2024); *see also Wilson v. Town of Mount Jackson*, No. 5:21-CV-00055, 2022 WL 819531, at \*12 (W.D. Va. Mar. 17, 2022) ("In a meritorious class-of-one claim, 'the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Such claims are generally precluded in the context of government employees.  *See Engquist v. Or. Dept. of Agr.*, 553 U.S. 591, 594, 605 (2008) ("A 'class-of-one' theory of equal protection has no place in the public employment context" when a plaintiff does not assert that disparate treatment was based on the employee's membership in any particular class.).  In *Engquist*, the Court explained that the "class-of-one theory of equal protection . . . is simply a poor fit in the public employment context."  *Id.* at 605.  The Court explained:

> To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

*Id.*

However, the Court still maintained that state employers still cannot "take personnel actions that would independently violate the Constitution."  *Id.* at 606.

*Engquist* controls here and precludes Unger's claim.  Government bodies are afforded "significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large."  *Id.* at 599.  As a government employee serving

at the discretion of the sheriff, Unger is barred from raising a class of one claim. *See, e.g., Torres v. Bowles*, No. 7:07-cv-00600, 2008 WL 2782945 at *1 (W.D. Va. July 17, 2008) (stating that "under *Engquist*, [the plaintiff], an at-will government employee, cannot raise a class of one claim under the Equal Protection Clause"); *Stickley v. Sutherly*, 5:09-cv-00004, 2009 WL 1806657 at *6 (W.D. Va. June 24, 2009) (holding that the plaintiff's "class-of-two" theory did cannot apply in the public employment context).

Despite *Engquist*, Unger maintains that his situation "falls outside the core concerns motivating the *Engquist* decision." (Compl. ¶ 164.) He argues that in "rare situation[s] where the governmental action is so arbitrary that it cannot be explained by any conceivable governmental purpose," government employees may still assert disparate discipline claims. (*Id.*) However, Unger provides no persuasive or relevant caselaw to support this distinction. In short, Unger fails to overcome the bar imposed by *Engquist*. Unger's equal protection relies on a "class of one" theory that is not available to him as a government employee. Accordingly, Carter's motion to dismiss Count IV will be granted. Count IV will be dismissed with prejudice.

**E. Count V: Defamation by Public Statements**

Unger's fifth claim alleges defamation by Carter's public statements. (*See* Compl. ¶¶ 178–97.) Unger asserts that through his press release and video, Carter sought to seriously harm Unger's reputation. (*See id.* ¶¶ 181–96.)

Under Virginia law, defamation requires: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Lokhova v. Halper*, 995 F.3d 134, 145 (4th Cir. 2021) (quoting

*Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018)).  Carter contests only the second element, "an actionable statement."  (*See* Carter Mem. at 12–13.)

"To be actionable, the statement must be both false and defamatory."  *Nigro v. Va. Commonwealth Univ./Med. Coll. Of Va.*, 492 Fed. App'x 347, 355 (4th Cir. 2012) (quoting *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005)).  Statements may only be false if they are factual in nature as opposed to "pure expressions of opinion." *Tharpe v. Saunders*, 737 S.E.2d 890, 893 (Va. 2013).  The question of "whether an alleged defamatory statement is one of fact or opinion is a question of law" and must be "decided by a court instead of a jury."  *Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858, 861 (Va. 2003).  Furthermore, "[a] defamation plaintiff must show that the alleged [defamation] was published 'of or concerning' him." *WJLA-TV v. Levin*, 564 S.E.2d 383, 390 (Va. 2002) (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985)).  "He need not show that he was mentioned by name in the publication." *Id.*  Instead, he must show "that the publication was intended to refer to him."  *Id.*

Carter argues that his statements are not actionable for two reasons.  First, Carter claims that his statements were opinion, not fact.  (Carter Mem. at 13.)  Second, he asserts that his statements were not "of or concerning" Unger because they do not reference him.  (*Id.*)

1.  <u>False statements</u>

Carter claims that his statements were not "demonstrably false."  (*Id.*)  Carter argues that Unger himself acknowledges that nothing said was "false" in a literal sense.  (*Id.*)  In addition, Carter claims that other statements, such as the statements that Unger engaged in "conduct unbecoming of a law enforcement officer" that reflected "an inability and unwillingness to uphold his sworn oath" were reasonable statements of opinion.  (*Id.*)

Carter's falsity argument fails for at least two of the statements in the May 7 press release. In that statement, Carter said that Unger made "no effort . . . to investigate the drunk driving incident." (Compl. ¶ 68.) Yet Unger alleges he assessed Ortts after arriving on the scene, and even administered a PBT. (*Id.* ¶¶ 25, 29.) Taking the facts alleged in the complaint as true, as the court must, Carter's statement that Unger made "no effort" is false. Additionally in his statement, Carter said that Unger "made the decision to charge reckless driving." (*Id.* ¶ 68.) But, as alleged in the complaint, Unger made no such choice, as he was *instructed* to issue a citation for reckless driving. (*Id.* ¶ 40.) Thus, the statement that Unger made the decision to charge reckless driving is false for present purposes.

Carter's falsity argument fails because at least two of the statements in the May 7 press release are false. Therefore, those two statements are false for the purposes of Unger's defamation claim.

### 2. Statements of fact vs. opinions

The court finds the other portions of the statement were expressions of opinion rather than statements of fact. Whether a statement is opinion or fact is determined by the court as a matter of law. *Fuste*, 575 S.E.2d at 861. In making its determination, courts may assess "whether the challenged statement can be objectively characterized as true or false, the author or speaker's choice of words, the context of the challenged statement within the writing or speech as a whole, and the broader social context into which the statement fits." *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 401 (E.D. Va. 2009) (citing *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183–84 (4th Cir. 1998)), *aff'd*, 639 F.3d 111 (4th Cir. 2011).

Carter's statement that Unger was unfit is not capable of being objectively characterized as true or false. This statement, and those like it, are opinionated in nature, not factual. However, as explained, above, two of Carter's public statements were false. As a result, Carter's claim that his statements were entirely opinions fails.

3. Of or concerning him

Last, Carter argues that because he did not mention Unger by name in his public statements, his statements were not "of or concerning" Unger. (*See* Carter Mem. at 13.) A plaintiff may meet the "of and concerning" requirement by "show[ing] that the publication was 'in its description or identification such as to lead those who knew or knew of the plaintiff to believe that the article was intended to refer to [him].'" *Gazette, Inc.*, 325 S.E.2d at 738 (quoting *Butler v. News-Leader Co.*, 51 S.E. 213, 215 (Va. 1905). Taking Unger's statements surrounding the small sizes of the community and law enforcement field as true, it would be reasonable to conclude that those who know Unger would recognize that Carter's statements referred to him. *See AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 508 (W.D. Va. 2013) (finding that a statement referring to "Evil Avenue" plausibly was intended and would be understood as referring to "AvePoint" based on context). Therefore, Unger has sufficiently alleged that there are "implications, inferences, or insinuations that *reasonably could be drawn* from each" of Carter's statements. *Blake v. Frederick Cnty. Fire and Rescue Dept.*, No. 5:24-cv-00068, 2025 WL 906794 at * 13 (quoting *Handberg v. Goldberg*, 831 S.E.2d 700, 707 (Va. 2019).

More directly still, as explained above, Carter's online video statement references a linked video that visually depicts "the deputy." Indeed, Carter's online video statement, quoted in full in the complaint (and above) informs readers of a "video" of Unger's exchange

in the parking lot with Ortts, and seemingly nudges viewers that they "may also notice that the deputy offered and received a fist bump with the driver as he left the Sheriff's Office." (Compl. ¶ 68.) While the online video statement referred to Unger only as "the deputy," surely linking a video that publicly show viewers *who the deputy is* constitutes sufficient identification. It is hard to imagine a more direct way for the statements to be "of or concerning" someone than referencing a video that depicts the person the statements are about. Accordingly, Carter's motion to dismiss Count V will be denied.

### F. Count VI: Defamation by Decertification Filing

Unger's sixth count alleges defamation based on Carter's submission to the DCJS. (*See* Compl. ¶ 201.) Unlike Count V, which focused on Carter's series of public statements, Unger cites only the language of the DCJS submission. (*See id.* ¶¶ 201–204(d).) This distinction is critical in determining whether Carter's statements were "false" for the purposes of a defamation claim.[8]

Unlike Count V, there are no objectively false statements in Carter's submission. For example, instead of claiming that Unger made "no effort to investigate the drunk driving incident," (*id.* ¶ 68), Carter instead states that Unger "did not properly and fully investigate the drunk driving incident," (*id.* ¶ 78,) which appears more opinionated in nature. Similarly, Carter does not include language indicating that Unger made the decisions on his own. Definitive statements such as Unger having "made a decision to charge reckless driving" (*Id.* ¶ 68) are

---

[8] In addition to the same arguments raised against Count V, Carter also argues that the DCJS statement is entitled to either absolute or qualified privilege. (*See* Carter Mem. at 14–15.) Because Count VI will be dismissed on other grounds, the court will not address this issue.

noticeably absent. The remaining statements are not "capable of being proven true or false" in the way that Carter's earlier public statements are. *Fuste*, 575 S.E.2d at 861.

The remaining pieces of Carter's DCJS submission are statements of opinion rather than statements of fact. Carter claims that "Unger's actions demonstrate that he is not committed to obeying the laws of the Commonwealth" and "do not uphold the public trust."[9] (*Id.* ¶ 78.) These statements are "relative in nature and depend largely upon [Carter]'s point of view." *Handberg*, 831 S.E.2d at 705–6 (quoting *Fuste*, 575 S.E.2d at 861). As "pure expressions of opinion", they "are constitutionally protected and cannot form the basis of a defamation action." *Tharpe*, 737 S.E.2d at 893 (internal quotations omitted).

Because Carter's DCJS submission lacks statements that "can be objectively characterized as true or false" in the way that his earlier statements do, they cannot be considered false for the purpose of defamation. *PBM Prods., LLC.*, 678 F. Supp. 2d at 401. Accordingly, Carter's motion to dismiss Count VI will be granted. Count VI will be dismissed without prejudice.

### G. Count VII: Tortious Interference with Business Expectancy

In his seventh count, Unger argues that by contacting SPD Chief Wayne Sager regarding his attendance of the DCJS hearing, Carter improperly attempted to interfere with Unger's business expectancy. (*See* Compl. ¶¶ 214–32.) Carter argues that because this interaction occurred before Unger's recertification and subsequent employment offer, there was no business expectancy to interfere with. (*See* Carter Mem. at 16–17.) Furthermore, Carter

---

[9] Other statements include Unger's actions being "unethical and …not adher[ing] to the ethical standards for a law enforcement officer" and "conduct unbecoming of a law enforcement officer." (Compl. ¶ 78.)

argues that the call did not constitute "improper methods" under Virginia law, nor did Unger incur any harm as a result. (*See id.* at 17–18.)

To establish a claim of intentional interference with a business expectancy, a plaintiff must show (1) he had a contract expectancy; (2) the defendant knew of the expectancy; (3) the defendant intentionally interfered with the expectancy; (4) the defendant used improper means or methods to interfere with the expectancy; and (5) plaintiff suffered a loss as a result of the defendant's disruption of the contract expectancy. *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 688 (Va. 2012). Additionally, when a plaintiff alleges interference with a business expectancy, rather than with an existing contract, the plaintiff must also allege that the defendant employed "improper methods." *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (Va. 1997). Improper methods include means "that are illegal or independently tortious," "violate an established standard of a trade or profession," constitute acts of "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship," or involve "[s]harp dealing, overreaching, or unfair competition." *Duggin v. Adams*, 360 S.E.2d 832, 836–37 (Va. 1987) (internal citations omitted).

The alleged conduct fails to meet the required elements of tortious interference. At the time of the call, July 16, 2024, Unger had no existing offer of employment. It was not until nearly four months later, on December 5, that Unger was reinstated and received his offer to work at the SPD. (*See* Compl. ¶¶ 91, 221.) To establish a claim for tortious interference with a business expectancy, Unger must show that he had a business expectancy

- 24 -

that was known to Carter at the time of the interference. *See Preferred Sys. Sols., Inc.*, 732 S.E.2d at 688. There is no indication that any offer existed at the time of the call. Rather, Chief Sager simply informed Carter that he "intended to offer [Unger] employment *if* reinstated." (Compl. ¶ 93) (emphasis added). Absent additional information, this fails to amount to a business expectancy that Carter would have been aware of. For this reason alone, Carter's acts could not constitute tortious interference with a business expectancy. Accordingly, Carter's motion to dismiss Count VII will be granted. Count VII will be dismissed without prejudice.

## H. Count VIII: Wrongful Termination in Violation of Virginia Public Policy

In his eighth claim, Unger asserts that his termination violates Virginia public policy. (*See* Compl. ¶¶ 233–48.) However, the public policies that Unger relies on are either misrepresented or misquoted entirely. In his motion, Carter argues that such erroneous statements of the law cannot serve as the foundation for Virginia public policy. (*See* Carter Mem. at 18–20.) The court agrees.

"Virginia strongly adheres to the employment-at-will doctrine." *Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 330 (Va. 1994). However, this rule "is not absolute." *Id.* In *Bowman v. State Bank of Keysville*, the Virginia Supreme Court recognized that terminations that violate public policy may constitute exceptions to employment-at-will. *See* 331 S.E.2d 797, 801 (Va. 1985). Since *Bowman*, however, the Virginia Supreme Court has emphasized that such exceptions are "narrow" and "termination of an employee in violation of the public policy underlying one statute does not automatically give rise to a common law cause of action to wrongful discharge." *VanBuren v. Grubb*, 733 S.E.2d 919, 922 (Va. 2012) (quoting *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002) (cleaned up)). "[T]here

are only three circumstances in which an at-will employee may establish that her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is 'explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy;' or (3) 'where the discharge was based on the employee's refusal to engage in a criminal act.'" *Hairston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *7 (W.D. Va. Aug. 24, 2023) (quoting *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 221 (4th Cir. 2015)).

As evidence of public policy that was violated, Unger cites two Virginia statutes and one Virginia Criminal Justice Services Board ("VCJSR") regulation. (*See* Compl. ¶¶ 237–39.) First, Unger states that Virginia Code § 15.2-1603 "mandates that deputies 'shall obey [the sheriff's] instructions' and creates the chain of command in sheriff's offices." (*Id.* ¶ 237.) This is not true. Section 15.2-1603 merely dictates how deputies are appointed and removed. Next, Unger argues that Virginia Code § 9.1-102(39) further reinforces a statutorily mandated chain of command within sheriff's departments by "authoriz[ing] the Criminal Justice Services Board to establish compulsory minimum standards for law enforcement officers, including requirements regarding chain of command and proper supervision within law enforcement agencies." (*Id.* ¶ 237.) This, too, is not true. Section 9.1-102(39) relates to community-policing programs in the Commonwealth, not minimum standards or chain of command. Finally, Unger claims that the VCJSR "has adopted regulations that require law enforcement agencies to maintain proper chain of command structures." (*Id.* ¶ 239.) Specifically, he cites 6 Va. Admin. Code 20-80-40 as a regulation "establishing minimum standards for law enforcement

- 26 -

agencies that include personnel management practices." (*Id.*)  Again, this is not true.  This regulation sets forth the minimum requirements for an instructor apprenticeship within the DCJS and makes no mention of sheriff's deputies or chain of command.

Aside from the misquoted statutes and regulation, Unger also argues that "[t]he Supreme Court of Virginia has held that termination based on an employee's refusal to violate the law or . . . exercise of a statutorily-created right constitutes wrongful discharge in violation of public policy." (*Id.* ¶ 245.)  It is true that an employer may not terminate an employee for refusing to engage in a criminal act.  *See VanBuren*, 733 S.E.2d at 922.  It is also true that statutes may create public policy that employees cannot be forced to contradict.  *See Lockhart*, 439 S.E.2d at 331.  However, neither of these rules applies to Unger's complaint.  At no point was Unger instructed to engage in a criminal act.

Other than misquoted statements of law and inapplicable Virginia Supreme Court precedent, Unger provides no evidence of a public policy violated by his termination.  This lack of support, coupled with the fact that Virginia "strongly adheres to the employment-at-will doctrine," undermines Unger's argument in favor of Count VIII.  *Id.* at 330.  Accordingly, Carter's motion to dismiss Count VIII will be granted.  Count VIII will be dismissed without prejudice.

## I. Count IX: Whistleblower Retaliation (Va. Code Ann. § 40.1-27.3(A))

In Count IX, Unger alleges that his conversation with Trooper Brill was protected as whistleblower activity under the Virginia Whistle Blower Protection Act ("VWPL"), Va. Code. Ann. § 40.1-27.3(A).  (*See id.* ¶¶ 249–63.)  Unger claims that his termination was the result of this protected activity.  (*See id.* ¶¶ 259–63.)

To bring a claim under the Act, a plaintiff must allege facts that demonstrate "(1) he made a good faith report of a federal or state violation to a supervisor, (2) was discharged by his employer, and (3) his report was the 'but for' cause of her discharge." *Workman v. LHC Grp., Inc.*, No. 1:23-cv-00048, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024) (quoting *Moore v. Copper River Shared Servs., LLC*, No. CL-2023-9565, 2024 WL 5454690, at *9 (Va. Cir. Ct. Jan. 30, 2024) (brackets omitted)). Here, Unger's claim falters on the first element.

The "good faith" standard does not require a plaintiff "to show that the underlying report of unlawfulness was in fact meritorious." *Workman*, 2024 WL 3572305 at *3 (quoting *Wood v. Bristol Va. Util. Auth.*, 661 F. Supp. 3d 538, 550 (W.D. Va. 2023)). Instead, a plaintiff "need only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Wood*, 661 F. Supp. 3d at 550 (quoting *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)). Furthermore, plaintiffs need not list the specific statute that they believed was violated. *See Chamberlain-Loving v. Renal Treatment Centers-Mid-Atlantic, Inc.*, No. 2:25-cv-24, 2025 WL 1646589, at *6 (E.D. Va June 9, 2025). However, mere allegations of "misconduct" and "unethical practices" are insufficient. *See Colquitt v. Bon Secour Mercy Health*, No. 4:21-cv-053, 2022 WL 479093, at *5 (E.D. Va. Feb. 16, 2022) (holding that plaintiff failed to assert that alleged "misconduct" and "unethical practices" violated any federal or state law or regulation), *aff'd*, No. 22-1288, 2022 WL 17848949 (4th Cir. Dec. 22, 2022) (per curiam).

Unger alleges that by reporting "concerns about potentially unlawful conduct during the April 5, 2024 incident," he made a good-faith report of a violation of law to a law-enforcement official. (*See* Compl. ¶¶ 251–55.) While Unger does not provide a particular law

that he believed was violated, he argues that the VWPL provides a "broad protective scope" of protection and that his report of "improper handling or a DUI investigation, including being instructed to deactivate his body camera, to issue a lesser charge despite evidence of intoxication above the legal limit, and subsequently being directed to destroy official documents" constituted a protected report.  (*Id.* ¶¶ 252–54.)

The facts alleged in Unger's fall short of the good faith standard.  On one hand, Unger is not required to prove that he listed "specific statute[s] that [he] believed were violated" in his conversation with Trooper Brill.  *Chamberlain-Loving*, 2025 WL 1646589, at *6.  However, vague allegations or concerns of misconduct are not enough.  *See Colquitt*, 2022 WL 479093, at *5 (holding that allegations of "unethical practices" and "misconduct" were insufficient).  Here, Unger claims that he "reported concerns" to Trooper Brill about his supervisors' handling of the DUI incident and told him that he "didn't feel right about it."  (Compl. ¶¶ 50, 251.)  Aside from this brief description, Unger provides no information that would distinguish his conversation from vague allegations of misconduct.  *See Colquitt*, 2022 WL 479093, at *5.  As a result, Unger fails to plausibly allege that his conversation with Trooper Brill constituted a good faith report under the VWPL.[10]  Without more detail on the April 6 conversation included in the complaint, Unger has failed to adequately plead a claim for relief under the VWPL.  Accordingly, Carter's motion to dismiss Count IX will be granted.  Count IX will be dismissed without prejudice.

---

[10] Unger attempts to correct this error in his response brief by citing various additional Virginia statutes that he would be aware of as a "trained law enforcement officer."  (*See* Unger Resp. at 34-35.)  However, this court "only looks to the Complaint on a motion to dismiss, not to *post hoc* allegations raised in later pleadings."  *Pryor v. Gotham Greens Butterhead, LLC*, No. 3:24-cv-00078, 2025 WL 1171593 at *4 n.3 (W.D. Va. Apr. 22, 2025) (quoting *Isernia v. Danville Reg'l Med. Ctr.*, No. 4:22-cv-00022, 2024 WL 4697681 at *12 (W.D. Va. Nov. 6, 2024).

### IV.    Conclusion

For the foregoing reasons, Carter's motion to dismiss (Dkt. 6) will be **GRANTED in part** and **DENIED in part.**

The motion will be **GRANTED** as to Counts III and IV, and those claims against Carter will be dismissed **with prejudice.**  That motion will be **GRANTED** as to Counts I, II, VI, VII, VIII, and IX, and those claims against Carter will be dismissed **without prejudice.** Carter's motion will be **DENIED** as to Count V.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this <u>28th</u> day of August, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE