IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| **Jacob T. Unger,**<br><br>Plaintiff,<br><br>v.<br><br>**Timothy C. Carter,**<br><br>Defendant. | Civil Action No. 5:25-cv-00029<br><br>**Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment** |

## INTRODUCTION

Defendant Timothy C. Carter seeks summary judgment on the one remaining claim of Plaintiff Jacob T. Unger, which rests on two sentences in Carter's May 7, 2024 public statement. Dkt. No. 37. Carter told the public that "no effort was made to investigate the drunk driving incident." He also said that "[t]he deputy made a decision to charge reckless driving and was instructed the proper code section for this violation." Mem. Op. 5–6, 20, Dkt. No. 13. The motion turns on whether the record could support a reasonable jury finding that Unger has shown actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986). Carter swears that he believed both statements. Carter Decl. ¶ 19, Dkt. No. 38-1.

Carter's own records permit a jury to find otherwise. Before he spoke, Carter reviewed an internal-investigation report. It records three accounts, including Sergeant Keith Staffa's own, that Staffa told Unger to issue a reckless-driving summons rather than charge DUI. Carter Decl. Ex. C, at 2–3, Dkt. No. 38-4. Two weeks before he spoke, Carter signed a submission to the Department of Criminal Justice Services stating that "the DUI Investigation was still ongoing" when Unger turned off his body camera and that "Unger's investigation concluded at that point." Harding Decl.

Ex. D, at Def. 0027 (Ex. 1). Two days later, Carter wrote in his own notes that Unger had told him Staffa said "something to the effect that the DUI needed to be changed to a Reckless driving charge." Harding Decl. Ex. A, at Def. 1116 (Ex. 1). A jury could find from these documents, by clear and convincing evidence, that Carter knew both statements were false or seriously doubted their truth. The same evidence makes falsity a jury question and defeats the statutory immunity Carter invokes.

## RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Local Civil Rule 56(b) and paragraph 15 of the Scheduling Order call for this separately captioned section. Unger responds below to each numbered paragraph of Carter's statement of undisputed material facts. Def.'s Mem. 2–7, Dkt. No. 38. He then states additional material facts with record citations. The additional facts show what Carter knew before May 7, 2024. Carter's statement rests on his declaration and its exhibits. Exhibits E, F, and G are videos that Carter submitted through the Court's drop box. Dkt. No. 38-6. This section cites Carter's exhibits as "Carter Decl. Ex. _*." Exhibits A through E to the Harding declaration are pages and a recording that Carter produced in discovery. Harding Decl.* ¶¶ *2–7. See Jones v. Chapman*_, No. ELH-14-2627, 2017 U.S. Dist. LEXIS 64781, at *10–11 (D. Md. Apr. 28, 2017) (rejecting defendants' challenge to the authenticity of documents that they had produced in discovery). Exhibit F is a newspaper article. Harding Decl. ¶ 8.

1. Undisputed for purposes of this motion. Carter's own investigation report adds that the Commonwealth's Attorney told Carter on April 19, 2024, that she had learned that Staffa, Unger, and Master Deputy Hank Hoover responded to the crash. Carter Decl. Ex. C, at 1.

2. Undisputed.

3. Undisputed that Carter reviewed the listed materials before May 7, 2024, including the internal-investigation report that is Exhibit C to his declaration. Carter Decl. ¶ 5. Paragraph 3 cites Exhibits A through G as the materials Carter reviewed.

Exhibit F is not the complete body-camera recording. Carter produced the complete recording in discovery as Def. 0020. Harding Decl. ¶ 7. Exhibit F is a redacted version of the recording. The Sheriff's Office's own outline lists the video among "Videos Redacted of Personal Identifiers," and its audit trail for the recording records the use of "Redaction Studio" on May 7, 2024. Harding Decl. Ex. D, at Def. 0031, 0113–0115.

In Exhibit F, the driver's face is blurred, and the recording has no sound in several places. One is where Unger tells the driver that he is going to talk to Hoover. Another is seconds before the camera goes off, where a name is called out twice. Carter's report describes that moment as Hoover and Unger calling Staffa over. Carter Decl. Ex. C, at 2. *Compare* Carter Decl. Ex. F, at 2:39–2:42, 3:42–3:45 (no sound), *with* Harding Decl. Ex. E, at 2:39–2:42, 3:42–3:45 (audible speech).

Carter's declaration describes Exhibits A through G as "true and accurate copies of records of the Shenandoah County Sheriff's office" and lists Exhibit F as "BWC footage." Carter Decl. ¶ 20. Neither the declaration nor the placeholder for the video exhibits says that Exhibit F is redacted. *Id.*; Dkt. No. 38-6.

Unger objects to Exhibit F to the extent that Carter offers it as the recording, and he is submitting the complete recording under paragraph 17 of the Scheduling Order. Fed. R. Civ. P. 56(c)(2); Dkt. No. 22; Harding Decl. Ex. E; *see* Fed. R. Evid. 106, 1003; *United States v. Hassan*, 742 F.3d 104, 134 (4th Cir. 2014) (stating that the rule of completeness exists to "prevent a party from misleading the jury" by "failing to introduce the entirety of the statement or document"

(citation omitted)). After such an objection, "the movant has the burden 'to show that the material is admissible as presented or to explain the admissible form that is anticipated.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538–39 (4th Cir. 2015) (quoting Fed. R. Civ. P. 56 advisory committee's note).

4. Undisputed that Unger gave a preliminary breath test with a result of .098; told the driver, Kyle Ortts, that he was over the legal limit; and did not perform field sobriety tests, arrest the driver, or charge him with DUI. Disputed as incomplete. Unger told Hoover that he thought he had a DUI, and Staffa then told Unger not to charge DUI. Carter Decl. Ex. C, at 2–3. Carter cites Exhibit F for this paragraph. The complete recording records two events that cannot be heard in Exhibit F. Less than a minute after telling the driver that he was under the influence of alcohol, Unger told the driver to wait and said that he was going to talk to Hoover. Harding Decl. Ex. E, at 2:35–2:45; Carter Decl. Ex. C, at 1 ("UNGER then tells ORTTS to stay where he is so he can talk to HOOVER."). Seconds before the camera went off, a name was called out twice. Harding Decl. Ex. E, at 3:42–3:45. Carter's report describes that moment. Carter Decl. Ex. C, at 2 ("They then call STAFFA over and the body camera cuts off.").

5. Immaterial. Neither challenged statement concerns the crash report. Unger does not concede Carter's characterization of it.

6. Undisputed that Unger issued a reckless-driving summons and that he retrieved and destroyed it the next day after Staffa presented two options. Undisputed for purposes of this motion that Unger did not categorize the body-camera recording for retention. Disputed that Unger chose reckless driving "rather than pursuing a DUI charge." Staffa told Unger not to charge DUI and to issue the reckless-driving summons. Carter Decl. Ex. C, at 2–3.

7. Undisputed for purposes of this motion, and immaterial.

8. Disputed. The report Carter reviewed records that Staffa told Unger which charge to bring, not only which code section to use. Staffa told the investigator that he "advised him to continue to investigate the crash and to issue ORTTS a summons for Reckless Driving, Fail To Maintain Control." Carter Decl. Ex. C, at 2. Hoover and Unger gave the same account. *Id.* at 3. Carter's declaration itself refers to "any advice or direction provided by other Sheriff's office personnel." Carter Decl. ¶ 17.

9. Undisputed that Staffa told Unger on April 6, 2024, that the summons carried the wrong code section and presented two options. Staffa also told the investigator that the code section Unger wrote was "not what STAFFA told him to write originally." Carter Decl. Ex. C, at 2.

10. Undisputed that the complaint so alleges. Immaterial to either challenged statement.

11. Undisputed that Carter disciplined Staffa before May 7, 2024. Carter's April 23, 2024 submission states that "Carter interviewed and disciplined the Patrol Supervisor." Harding Decl. Ex. D, at Def. 0027. Carter's characterization of Staffa's April 6 advice is immaterial to either challenged statement.

12. Undisputed that Carter so states. Immaterial. The challenged statement concerns who made the decision to charge reckless driving, not whom Carter holds accountable for it.

13. Undisputed that Unger issued the reckless-driving summons. Disputed that issuing the summons means that Unger made the decision to charge reckless driving instead of DUI. Carter Decl. Ex. C, at 2–3.

14. Undisputed that Carter so concluded. Immaterial, because his conclusion about responsibility does not bear on whether either statement was false or whether he knew it was false.

15. Undisputed that Carter issued a public statement on May 7, 2024. Its text appears in the record as quoted in the Memorandum Opinion. Mem. Op. 5–6. The press release, Exhibit E, is one of the videos that Carter submitted through the Court's drop box. Dkt. No. 38-6.

16. Disputed in part. The statement said that "[t]he deputy made a decision to charge reckless driving and was instructed the proper code section for this violation." Mem. Op. 6. It did not say that a supervisor told the deputy not to charge DUI or told him to charge reckless driving.

17. Disputed. The statement disclosed that the deputy "approached another Patrol deputy and later the deputy approached a supervisor, and the field camera was cut off," and that the deputy "was instructed the proper code section." *Id.* It attributed "a decision to charge reckless driving" to the deputy. *Id.*

18. Disputed. Paragraph 18 states Carter's present account of his meaning. The statement said that "no effort was made to investigate the drunk driving incident." Mem. Op. 5. Two weeks earlier, Carter had stated in writing that "the DUI Investigation was still ongoing" when Unger turned off the camera. Harding Decl. Ex. D, at Def. 0027.

19. Disputed. The word "meaningful" does not appear in the May 7 statement. Mem. Op. 5. Carter's April 22 letter and April 23 submission each describe Unger's "investigation" as having "concluded." Harding Decl. Ex. D, at Def. 0027, 0184.

20. Disputed. A jury may weigh Carter's profession of belief against his own documents. *See infra* ¶¶ 26–45.

21. Disputed. The statement attributed a "decision" to Unger, not the issuance of a summons. The report Carter reviewed attributes the decision to Staffa. Carter Decl. Ex. C, at 2–3.

22. Undisputed that Unger issued the summons. Disputed that the other personnel only "provided advice regarding the summons." Staffa told Unger not to charge DUI and to issue the reckless-driving summons. Carter Decl. Ex. C, at 2–3.

23. Undisputed for purposes of this motion that the statement concerned a matter of public concern.

24. Undisputed that the statement said Carter had disciplined the supervisor. Carter Decl. ¶ 18. Carter's reasons are immaterial. The statement did not disclose what the supervisor had told Unger, and it attributed the charging "decision" to Unger. Mem. Op. 6.

25. Disputed. Carter's statement of his belief does not resolve his state of mind on this record. *See infra* ¶¶ 26–45.

**Additional Material Facts**

26. On April 20, 2024, Captain Glenn D. Ogle Jr. interviewed Staffa, Hoover, and Unger. Carter Decl. Ex. C, at 2–3.

27. The report records Staffa's account that, after Unger reported the breath-test result, "STAFFA told him since he offered the PBT before doing SFST's, if he wanted to charge him with DUI, it would not hold up in court. STAFFA advised him to continue to investigate the crash and to issue ORTTS a summons for Reckless Driving, Fail To Maintain Control." *Id.* at 2.

28. Hoover told Ogle that Unger reported that the driver "submitted to a PBT with the .09 results" and that Unger "thinks he has a DUI." *Id.* at 3. Hoover also told Ogle that "STAFFA says don't charge him with DUI but investigate the crash and issue a summons for Reckless Driving." *Id.*

29. Unger told Ogle that "STAFFA said do not charge him with DUI but to work the crash and write a summons for Reckless Driving, Fail To Maintain Control." *Id.*

30. Sergeant Dwayne Green, who advised Unger on April 6 or 7, 2024, to get the correct reckless-driving charge, told Ogle that Unger "told him about STAFFA's decision." Carter Decl. Ex. C, at 4.

31. Carter reviewed the investigation report before May 7, 2024. Carter Decl. ¶ 5.

32. Carter's April 22, 2024 termination letter states that Unger "performed a preliminary breath test/field sobriety test," that "your investigation concluded at that point," and that Unger "did not properly and fully investigate the incident of Driving Under the Influence." Harding Decl. Ex. D, at Def. 0184.

33. On April 23, 2024, Carter signed a Notification of Eligibility for Decertification and referred the Department to an attached statement. Harding Decl. Ex. D, at Def. 0026. That statement says that when Unger approached his patrol sergeant, "he immediately cuts his body/field camera off," that "the DUI Investigation was still ongoing at this point," and that "Unger's investigation concluded at that point." *Id.* at Def. 0027. It also says that "Carter interviewed and disciplined the Patrol Supervisor." *Id.*

34. In his declaration, Carter describes the "no effort" statement as his conclusion "that no meaningful DUI investigation was conducted." Carter Decl. ¶ 15. He also states that Unger issued the summons "[r]egardless of any advice or direction provided by other Sheriff's office personnel." *Id.* ¶ 17.

35. Carter cites his Exhibit D, a transcript of the body-camera recording, among the materials he reviewed before May 7, 2024. Def.'s Mem. 2–3, Dkt. No. 38. The transcript records that Unger asked the driver how much he had drunk, gave the breath test, told him that he was "under the influence of alcohol," and asked how long ago he had been drinking. Carter Decl. Ex. D, at 1, Dkt. No. 38-5. It records Hoover saying "Officer discretion" and Unger answering "How is that

officer discretion." *Id.* It records Unger then saying "I know what I have to do, I know I got to do it," and Hoover saying "You can turn it off" before the camera cut off. *Id.* at 2.

36. Carter's handwritten notes dated April 25, 2024, record his April 22 meeting with Unger. Harding Decl. Ex. A, at Def. 1110, 1114 (Ex. 1). Carter asked why Unger had turned off his camera and never turned it back on. Carter wrote that Unger "never really answered except to say that Staffa said something to the effect that the DUI needed to be changed to a Reckless driving charge." *Id.* at Def. 1116. Carter wrote that Unger "was trying to lay all the blame on Staffa." *Id.* at Def. 1115. He also wrote that he reminded Unger "of his training and that the call . . . was his case." *Id.* at Def. 1117.

37. The same notes record that Carter had met with Staffa. *Id.* at Def. 1112. Notes of a meeting that Carter and Major Kolter Stroop held with Staffa, also in Carter's production, record that "Staffa stated that he felt Unger had mishandled the DUI & when he told him to issue the summons, Unger wrote it under the wrong code section," and that "Staffa appeared to be honest & admitted fault." Harding Decl. Ex. B, at Def. 1126 (Ex. 1) (citation modified).

38. On April 23, 2024, Carter met with the Commonwealth's Attorney. *Id.* at Def. 1125. Carter's notes of that meeting record that she asked why he fired Unger and not Staffa. Harding Decl. Ex. C, at Def. 1119 (Ex. 1). Carter "told her that Staffa was truthful and Unger lied to me. It was Unger's case, and I agreed that Staffa gave bad advice, but also gave a proper option." *Id.* at Def. 1119–1120.

39. Carter produced the body-camera recording in discovery as Def. 0020. Harding Decl. ¶ 7 & Ex. E. The Sheriff's Office's audit trail for the recording identifies it by the title "Axon Body 3 Video 2024-04-05 2338 X60AC0762," names Unger as the uploader, and records "Evidence Authenticity Validated." Harding Decl. Ex. D, at Def. 0106.

40. The complete recording records Unger telling the driver to wait and saying that he was going to talk to Hoover. Harding Decl. Ex. E, at 2:35–2:45. It records a name called out twice seconds before the camera went off. Harding Decl. Ex. E, at 3:42–3:45. Carter's investigation report describes both events, the second as Hoover and Unger calling Staffa over. Carter Decl. Ex. C, at 1–2.

41. Exhibit F has no sound at either place. Carter Decl. Ex. F, at 2:39–2:42, 3:42–3:45. Carter's transcript of the recording has no entry between 2:29 and 3:16. Carter Decl. Ex. D, at 1.

42. The audit trail records that on May 7, 2024, a member of the Sheriff's Office opened the recording in "Redaction Studio," that a "Redaction Studio evidence extraction request" was received, and that a video clip titled "(Extraction 2.1) Axon Body 3 Video 2024-04-05 2338 X60AC0762" was added. Harding Decl. Ex. D, at Def. 0113–0115. The Sheriff's Office's outline of documents for Unger's decertification hearing lists "Videos Redacted of Personal Identifiers," and the first video listed is the April 5, 2024 body-camera video. *Id.* at Def. 0031.

43. Carter issued his public statement the same day. In the statement he said, "The body field camera video associated with this crash is linked to this release." Mem. Op. 6. The Sheriff's Office's Facebook post of that date, "Published by Timothy C. Carter," says, "Body worn camera video and SCSO Building security camera video are linked in the description of the press release." Harding Decl. Ex. D, at Def. 0084. Carter's notes record that at the April 22 meeting he told Unger that he would "release the videos of the incident." Harding Decl. Ex. A, at Def. 1117.

44. Carter played the body-camera recording at his April 22, 2024 meeting with Unger. His notes state that he "went over both videos" with Unger, the "body camera and building camera," and that he "paused the video" at several points. Harding Decl. Ex. A, at Def. 1114. Major Stroop's notes of the same meeting state that Carter "went through the body cam footage." Harding Decl.

Ex. B, at Def. 1124. The audit trail records that the recording was streamed three times on the afternoon of April 22, 2024, under Stroop's account. Harding Decl. Ex. D, at Def. 0110. The audit trail records no use of Redaction Studio on the recording before May 7, 2024. Harding Decl. Ex. D, at Def. 0106–0113.

45. Carter also gave an interview to The Northern Virginia Daily on May 7, 2024. Harding Decl. Ex. D, at Def. 0084 ("Today Sheriff Timothy Carter interviewed with the Northern Virginia Daily regarding a vehicle crash investigation that occurred last month."). The newspaper's article of that date quotes Carter as saying, "There wasn't a lot of detail with regard to investigating a drunk-driving incident." Harding Decl. ¶ 8 & Ex. F, at 2.

## LEGAL STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* The Fourth Circuit has long recognized that summary judgment is "seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Where a plaintiff must prove actual malice by clear and convincing evidence, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 477 U.S. at 255–56.

## ARGUMENT

Defamation under Virginia law requires "(1) publication of (2) an actionable statement with (3) the requisite intent." Mem. Op. 18–19 (quoting *Lokhova v. Halper*, 995 F.3d 134, 145 (4th Cir. 2021)). Carter does not dispute publication. His motion challenges the requisite intent through actual malice and the statutory immunity, and the actionable statement through falsity and opinion. Def.'s Mem. 8–18, Dkt. No. 38. The record creates a genuine dispute on each challenge. A jury could find actual malice (Part I), falsity is a question for the jury (Part II), the "no effort" statement is an assertion of fact (Part III), and the statute provides neither immunity nor fees (Part IV). Unger addresses actual malice first because the same evidence resolves the remaining grounds.[1]

### I. A Jury Could Find by Clear and Convincing Evidence that Carter Published Both Statements with Actual Malice, Because His Own Records Contradicted Them.

A public official must prove that the defendant made a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Reckless disregard requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The test is subjective, but a defendant's testimony about his own belief does not end it. A defendant "cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true," and the "finder of fact must determine whether the publication was indeed made in good faith." *Id.* at

[1] For purposes of this motion only, Unger accepts that he must prove actual malice as a public official. He reserves the question whether a patrol deputy is a public official. Neither *St. Amant* nor *Cannon*, the two binding authorities Carter cites, decided it. *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968) (accepting "[f]or purposes of this case" the Louisiana courts' determination); *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022) (assuming without deciding); *see Nash v. Keene Publ'g Corp.*, 127 N.H. 214, 222, 498 A.2d 348, 353 (1985) (holding that "a patrolman should not be considered a public official as a matter of law").

732. A plaintiff "is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).

Information in the speaker's possession that contradicts the statement is circumstantial evidence of that kind. This Court denied summary judgment on actual malice where the record gave the author "a reasonable basis upon which she would likely understand that her portrayal of Eramo was inaccurate." *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 874 (W.D. Va. 2016). The Court weighed the circumstantial evidence as a whole rather than item by item. *Id.* at 875. Failure to investigate "will not alone support a finding of actual malice." *Id.* at 871 (quoting *Harte-Hanks*, 491 U.S. at 692). The question is therefore what information the speaker had, not what he could have learned. Carter had the information that made both statements false.

### A. Carter's Investigation Report and His Own Notes Told Him that Staffa, Not Unger, Decided to Charge Reckless Driving.

Before May 7, 2024, Carter reviewed an internal-investigation report that attributed the charging decision to Staffa. Carter Decl. ¶ 5. The report records three accounts of the charging decision, and all three describe Staffa telling Unger to issue the reckless-driving summons. Staffa told the investigator that he "advised him to continue to investigate the crash and to issue ORTTS a summons for Reckless Driving, Fail To Maintain Control." Carter Decl. Ex. C, at 2. Hoover said that "STAFFA says don't charge him with DUI but investigate the crash and issue a summons for Reckless Driving." *Id.* at 3. Unger said that "STAFFA said do not charge him with DUI but to work the crash and write a summons for Reckless Driving, Fail To Maintain Control." *Id.* The report also records that the code section Unger wrote was "not what STAFFA told him to write originally," and it refers to "STAFFA's decision." *Id.* at 2, 4.

Carter also knew Staffa's role from other sources. He personally interviewed and disciplined Staffa by April 23. Harding Decl. Ex. D, at Def. 0027. Notes of Carter's meeting with Staffa

record Staffa's statement that "when he told [Unger] to issue the summons, Unger wrote it under the wrong code section." Harding Decl. Ex. B, at Def. 1126 (citation modified). Carter's own notes, written on April 25, record that Unger told him "that Staffa said something to the effect that the DUI needed to be changed to a Reckless driving charge." Harding Decl. Ex. A, at Def. 1116. Carter wrote that Unger "was trying to lay all the blame on Staffa." Harding Decl. Ex. A, at Def. 1115. But Staffa's own accounts, to the investigator and to Carter, said that Staffa told Unger to issue the summons. A jury could find that Carter could discount Unger's account only by disregarding Staffa's.

Carter's notes also record his view that Unger was "trying to let his buddy off, at first with the DUI, then the Reckless Driving charge," and that "Unger lied to me." Harding Decl. Ex. A, at Def. 1115; Harding Decl. Ex. C, at Def. 1120. Carter will offer those passages as evidence of his belief. But the same notes show that Carter credited Staffa. He told the Commonwealth's Attorney "that Staffa was truthful," and he explained Unger's fault by saying that "[i]t was Unger's case." Harding Decl. Ex. C, at Def. 1119–1120. The notes of Carter's meeting with Staffa record that Staffa "appeared to be honest & admitted fault" in the conversation in which Staffa said he told Unger to issue the summons. Harding Decl. Ex. B, at Def. 1126 (citation modified). A jury could find that Carter blamed Unger, because the case was Unger's, for a decision Carter knew Staffa had made. Carter's brief advances the same theory of responsibility. Def.'s Mem. 13, Dkt. No. 38. But the published sentence did not say that Unger was responsible. It said that he "made a decision to charge reckless driving." Mem. Op. 6. Whether Carter believed that sentence is a question his own notes leave for the jury. *Anderson*, 477 U.S. at 255.[2]

[2] The Supreme Court of Virginia has affirmed summary judgment for an editorial writer even though his newspaper's files, and interview notes that "purportedly indicated" a fact contrary to one of his statements, were in the record. *Jackson v. Hartig*, 274 Va. 219, 227, 229–30, 645 S.E.2d

Carter nonetheless attributed the decision to Unger. After reviewing that information, he told the public that "[t]he deputy made a decision to charge reckless driving and was instructed the proper code section for this violation." Mem. Op. 6. The sentence assigned the charging decision to Unger and described the supervisor's role as limited to a code section. A jury could find that Carter knew the decision was Staffa's when he attributed it to Unger. Carter's declaration describes his understanding before publication as limited to advice "regarding the proper code section." Carter Decl. ¶¶ 9, 17. The report he reviewed says otherwise, and so do his own notes. Harding Decl. Ex. A, at Def. 1116. His own declaration also refers to "any advice or direction provided by other Sheriff's office personnel." Carter Decl. ¶ 17. A jury is entitled to weigh Carter's account of his understanding against the documents he read. *St. Amant*, 390 U.S. at 732.

The partial disclosure of a supervisor's involvement strengthens that inference. Carter told the public that the deputy approached a supervisor and received instruction on the code section. He omitted the instruction the report recorded, which was not to charge DUI. A jury could find that a speaker who discloses the minor part of a supervisor's role and withholds the decisive part knew what the supervisor did. The footage Carter reviewed also recorded Unger questioning the suggestion of leniency. When Hoover said "Officer discretion," Unger asked, "How is that officer

---

303, 307, 309 (2007). That decision does not reach this record. The editorial in *Jackson* said that a former school board member bore responsibility for a budget deficit, and the author relied on a special grand jury report that said the same, with no fact in the record showing that he "had any reason to question the accuracy" of the report. *Id.* at 230–31, 645 S.E.2d at 309–10. Most of the contrary information sat in files the author had not reviewed, and the court held that the notes did not show he knew that the one false statement, that the plaintiff had resigned, was untrue. *Id.* at 226, 230, 645 S.E.2d at 306–07, 309. Carter read his sources himself, and they contradicted the statement he published. He recorded his own finding that the supervisor whose account contradicted that statement was "truthful." Harding Decl. Ex. C, at Def. 1119. And Carter did not publish that Unger was responsible. He published that Unger made the decision.

discretion." Carter's transcript records Unger then saying, "I know what I have to do, I know I got to do it." Carter Decl. Ex. D, at 1–2.

The complete recording is further information in Carter's possession that contradicted his statement. Carter states that he reviewed the body-camera footage before he spoke. Carter Decl. ¶ 5. His own notes record that on April 22, 2024, he "went over both videos" with Unger and "paused the video" at several points. Harding Decl. Ex. A, at Def. 1114. The audit trail records that the recording was streamed that afternoon under the account of Major Stroop, who attended the meeting. Harding Decl. Ex. D, at Def. 0110; Harding Decl. Ex. B, at Def. 1124. The Sheriff's Office did not open the recording in Redaction Studio until May 7, 2024. Harding Decl. Ex. D, at Def. 0113. A jury could therefore find that Carter watched the complete recording. That recording records Unger telling the driver that he was going to talk to Hoover, and it records the call that Carter's investigation report describes as Hoover and Unger calling Staffa over, seconds before the camera went off. Harding Decl. Ex. E, at 2:35–2:45, 3:42–3:45; Carter Decl. Ex. C, at 1–2. A jury could find that a sheriff who watched his deputy turn first to a fellow deputy and then to his sergeant knew that the charging decision did not begin and end with the deputy. The version of the recording that Carter submitted with his motion has no sound at either place, and his transcript has no entry for the first. Carter Decl. Ex. F, at 2:39–2:42, 3:42–3:45; Carter Decl. Ex. D, at 1. The Court should therefore assess what the footage showed Carter from the complete recording. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (relying on a video at summary judgment where there were "no allegations or indications that this videotape was doctored or altered in any way").

A responsibility to issue a charge is not a decision about which charge to bring. The report concluded that Unger "had a responsibility to charge ORTTS with Reckless Driving," but the published word was "decision." Carter Decl. Ex. C, at 4. Carter's view that deputies are accountable

for the charges they issue explains whom he blamed. Carter Decl. ¶¶ 11–12. It does not make true the statement that Unger made the decision. A reasonable jury could find by clear and convincing evidence that Carter published the reckless-driving statement knowing it was false.

### B. Carter's Own Writings Described an Investigation That Was Under Way and Then Concluded, Not One Never Begun.

Carter knew that the "no effort" statement was false, because he had described Unger's effort himself. The statement asserted that Unger made no effort to investigate the drunk-driving incident. Mem. Op. 5, 20. On April 22, he wrote to Unger that Unger "performed a preliminary breath test/field sobriety test" and that "your investigation concluded at that point." Harding Decl. Ex. D, at Def. 0184. The next day, he signed a statement to the Department of Criminal Justice Services that "the DUI Investigation was still ongoing" when Unger turned off the camera and that "Unger's investigation concluded at that point." Harding Decl. Ex. D, at Def. 0026–0027. His own investigator concluded that Unger "did not correctly investigate," not that he made no effort. Carter Decl. Ex. C, at 4. On the day he published the statement, Carter told a newspaper that "[t]here wasn't a lot of detail with regard to investigating a drunk-driving incident." Harding Decl. Ex. F, at 2. A jury could find that a speaker who described the investigation in those words knew that "no effort" was untrue.

The footage Carter reviewed showed the effort itself. Carter's transcript of it records that Unger asked the driver how much he had drunk, gave the breath test, told him that he was "under the influence of alcohol," and asked how long ago he had been drinking. Carter Decl. Ex. D, at 1; Def.'s Mem. 2–3, Dkt. No. 38. The investigator's report also records that Unger told Hoover he thought he had a DUI. Carter Decl. Ex. C, at 3. Although Unger told the investigator that he "was not confident and did not want to make the wrong decision" about detaining the driver, that account

describes an investigation that stopped short of an arrest. *Id.* It does not describe the absence of any effort.

Two weeks after the April 23 submission, Carter told the public that "no effort was made," although his own documents described an investigation. Mem. Op. 5. The same phrase appears in the April 22 letter and the April 23 submission. But each document also says that Unger's investigation "concluded," and the April 23 submission says that the investigation "was still ongoing" when Unger turned off his camera. Harding Decl. Ex. D, at Def. 0027, 0184. When a speaker writes in one document that an investigation was ongoing or that it concluded, he knows that the same document's statement that "no effort was made" is untrue. This Court has already distinguished an accusation of no effort from a criticism of the investigation. At the pleading stage, it treated "no effort" as a false statement of fact and contrasted it with Carter's statement to the Department that Unger "did not properly and fully investigate," which "appears more opinionated in nature." Mem. Op. 20, 22–23. Carter chose the false version for the public. His declaration now adds the word "meaningful," which the public statement did not contain. Carter Decl. ¶ 15; Mem. Op. 5. A jury could find from these facts that Carter knew the "no effort" statement was false or seriously doubted its truth.

## II. Substantial Truth Is a Question for the Jury Because the Record Shows that Each Statement's Sting Was False.

Truth in substance defeats a defamation claim, but only when the defamatory charge itself is true. "Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially' true." *Saleeby v. Free Press, Inc.*, 197 Va. 761, 763, 91 S.E.2d 405, 407 (1956). Minor inaccuracies do not amount to falsity "so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 15 Cal. App. 2d 710,

714, 59 P.2d 1063, 1064 (1936)). A statement is not substantially true if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (quoting Robert D. Sack, *Libel, Slander, and Related Problems* 138 (1980)). "The falsity of a statement and the defamatory 'sting' of the publication must coincide . . . ." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

Whether a statement's sting is true is ordinarily a question for the jury. In Virginia, "[w]hether a plaintiff has sufficiently proven the falsity of the alleged defamatory statements is a jury question." *Jordan v. Kollman*, 269 Va. 569, 576, 612 S.E.2d 203, 207 (2005). The Fourth Circuit vacated a summary judgment on substantial truth where the defendant's statement presupposed an act the plaintiff never performed. The court held that "a jury could interpret the gist of that statement differently, and we think it is premature to decide otherwise." *Robinson v. Williams*, 59 F.4th 113, 115, 118 (4th Cir. 2023).

The sting of the reckless-driving statement is that Unger chose to let a driver who tested over the legal limit leave with a lesser charge. That sting is false on this record because Staffa made the choice and told Unger to carry it out. Carter Decl. Ex. C, at 2–3; Harding Decl. Ex. B, at Def. 1126. The statement that the deputy "made a decision to charge reckless driving" presupposes a decision Unger did not make. In the same way, the statement in *Robinson* that the plaintiff "misread" an echocardiogram presupposed a reading she never performed. 59 F.4th at 118. A listener told that Unger decided to reduce the charge would form a different view of him than a listener told that his sergeant ordered the lesser charge after Unger reported a breath test over the legal limit. Carter's brief substitutes "responsibility" for the published word, which was "decision." Def.'s Mem. 13, Dkt. No. 38. At the pleading stage, this Court treated the statement as factual and false, and it contrasted the statement with Carter's submission to the Department, which did "not

include language indicating that Unger made the decisions on his own." Mem. Op. 20, 22. The record now supports what the complaint alleged.

The sting of the "no effort" statement is a complete failure to act. The facts disclosed around the phrase do not change that meaning. A listener told that the deputy obtained a breath-test result over the legal limit and then made "no effort" to investigate understands that the deputy did nothing further despite that evidence. The record shows that Unger questioned the driver, gave a breath test, told the driver he was over the limit, and reported to Hoover that he thought he had a DUI. Carter Decl. Ex. C, at 1–3; Carter Decl. Ex. D, at 1–2. Carter's own documents call that conduct an investigation that "concluded." Harding Decl. Ex. D, at Def. 0027, 0184. The difference between an investigation that ended too early and no effort at all is the difference between a criticism of judgment and an accusation of complete dereliction. A jury could find that the two produce different effects on the listener. *Masson*, 501 U.S. at 517.

## III. The "No Effort" Statement Is an Assertion of Fact Because It Can Be Proven False and the Facts Carter Disclosed Were Incomplete.

Whether a statement is fact or opinion is a question of law for the Court. Mem. Op. 20. At the pleading stage, this Court treated the "no effort" statement as a factual assertion and set it apart from statements that are not "capable of being proven true or false" in the same way. *Id.* at 20–23. The Court reached that conclusion after quoting the statement, including every fact Carter now says gives the phrase its context. *Id.* at 5–6. Nor is the word "investigation" inherently evaluative. Carter used it as a description when he told the Department that "the DUI Investigation was still ongoing" and that "Unger's investigation concluded at that point." Harding Decl. Ex. D, at Def. 0027. Either someone makes an effort or no one does, and the record shows that Unger made one. A statement of opinion based on disclosed facts also implies a false assertion of fact when

"those facts are either incorrect or incomplete." *Schaecher v. Bouffault*, 290 Va. 83, 104, 772 S.E.2d 589, 600 (2015) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–19 (1990)).

Carter's disclosed facts were incomplete in the respect that mattered most. The May 7 statement told the public that Unger gave a breath test and approached a deputy and a supervisor, that "the field camera was cut off," and that the deputy "made a decision to charge reckless driving." Mem. Op. 5–6. It did not disclose that the supervisor told Unger not to charge DUI. Carter Decl. Ex. C, at 2–3. Nor did it disclose that Hoover told Unger he could turn off the camera. Carter Decl. Ex. D, at 2. A listener given the disclosed facts would conclude that Unger abandoned the DUI investigation on his own. The omitted fact explains why the investigation ended. The statement did not say that the investigation was inadequate. It said that no effort was made. Mem. Op. 5. Whatever evaluative content the word "investigation" carries, the phrase "no effort" asserts a fact. The Court has already contrasted that assertion with the opinion that Unger "did not properly and fully investigate." Mem. Op. 22. The "no effort" statement remains an actionable assertion of fact.

## IV. Virginia Code § 8.01-223.2 Gives Carter Neither Immunity nor Fees.

The statute grants immunity for statements "regarding matters of public concern that would be protected under the First Amendment." Va. Code Ann. § 8.01-223.2(A). Subsection B then withdraws that immunity. "The immunity provided by this section shall not apply to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." *Id.* § 8.01-223.2(B). It allows fees only to a person who prevails "pursuant to the immunity provided by this section," and then provides that the person "may be awarded reasonable attorney fees and costs." *Id.* § 8.01-223.2(C).

### A. The Evidence That Creates a Jury Question on Actual Malice Also Defeats the Immunity.

The evidence of actual malice in Part I also removes both statements from the immunity. The Supreme Court of Virginia applied that subsection by asking whether the complaint's allegations implied that the defendants "either: (1) knew that the statements at issue were false, or (2) recklessly disregarded the falsity of the statements at issue." *Brooks-Buck v. Wahlstrom*, 304 Va. 470, 484, 921 S.E.2d 223, 231 (2025). When the evidence of the declarant's state of mind conflicts, the jury decides the question. *Alexis v. Kamras*, No. 3:19-cv-00543, 2020 U.S. Dist. LEXIS 227962, at *55–56 (E.D. Va. Dec. 3, 2020) (applying the statute's prior text). Part I shows that a jury could find Carter knew both statements were false or seriously doubted their truth, whichever party bears the burden on the exception. Carter is not entitled to immunity as a matter of law.

### B. Subsection B Also Reaches Statements the Declarant Should Have Known Were False, and Carter's Fee Request Fails in Any Event.

The words "should have known" extend subsection B beyond constitutional actual malice. The subsection names three mental states in the disjunctive, which are knowledge, constructive knowledge, and reckless disregard. Va. Code Ann. § 8.01-223.2(B). "[E]very part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998). If subsection B meant only actual malice, "knew" and "reckless disregard" would state it in full, and "should have known" would do no work.

No court has construed the words "should have known." Several courts have described subsection B as coextensive with actual malice. *See, e.g.*, *Auckland v. Gilead Scis., Inc.*, No. 7:24-cv-00501, 2025 U.S. Dist. LEXIS 14921, at *12 (W.D. Va. Jan. 28, 2025). The Court of Appeals of Virginia has said that the exception "echoes the actual malice standard." *Hale v. Cauzzort*,

No. 1389-24-4, 2026 Va. App. LEXIS 153, at *8 (Ct. App. Mar. 17, 2026) (unpublished). *Hale* applied the statute's 2020 text and noted the 2023 amendment without construing the words it added. *Id.* at *7 n.3. Carter cites an unpublished decision for that reading. Def.'s Mem. 16, Dkt. No. 38. The decision says only that "if a statement is made with 'actual malice,' immunity cannot apply." *Petrak v. Sawyers*, No. 0110-24-4, 2025 Va. App. LEXIS 655, at *14 (Ct. App. Oct. 21, 2025) (unpublished). That sentence makes actual malice sufficient to remove the immunity, not the only ground for removing it. *Brooks-Buck* had no occasion to reach those words after finding the first two grounds adequately alleged. 304 Va. at 485, 921 S.E.2d at 231. On this record, Carter should have known at a minimum that the reckless-driving statement was false, because the report he reviewed recorded three accounts that Staffa told Unger to issue the summons instead of charging DUI, and Staffa told Carter the same thing. Harding Decl. Ex. B, at Def. 1126. He should have known that the "no effort" statement was false, because his own April 22 and April 23 documents described an investigation that "concluded."

Carter's request for fees fails for two further reasons. First, the statute provides that a prevailing defendant "may be awarded" fees, which commits the award to the Court's discretion. Va. Code Ann. § 8.01-223.2(C). Second, fees are available only to a defendant who prevails "pursuant to the immunity provided by this section." *Id.* A judgment resting on the constitutional actual-malice requirement, or on falsity or opinion, would not be a judgment "pursuant to the immunity." This Court has denied statutory fees where the dismissal did not rest on the immunity. *Malone v. Breggin*, 726 F. Supp. 3d 555, 565 (W.D. Va. 2024). Carter's brief merges the constitutional standard and the statutory immunity. Def.'s Mem. 16–18, Dkt. No. 38. Only the statutory immunity supports fees.

## CONCLUSION

Unger respectfully asks the Court to deny Carter's Motion for Summary Judgment, Dkt. No. 37, and with it his request for attorney's fees.

Respectfully submitted,

Jacob T. Unger
By Counsel

/s/ Elliott M. Harding
Elliott M. Harding (VSB No. 90442)
Harding Counsel, PLLC
123 East Main Street, Eighth Floor, Suite 8B
Charlottesville, Virginia 22902
(434) 962-8465
elliott@hardingcounsel.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

/s/ Elliott M. Harding
Elliott M. Harding (VSB No. 90442)